06-4719-cv
O&G Indus., Inc. v. Nat'l R.R. Passenger Corp.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: October 23, 2007     Decided: August 8, 2008)

Docket No. 06-4719-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

O&G INDUSTRIES, INC.,

Third-Party-Defendant Appellant,

HARTFORD FIRE INSURANCE CO. AND DAVID E. ROBERTS, ADMINISTRATOR FOR THE ESTATE OF GREGORY J. ROBERTS,

Plaintiffs,

PETER QUINTILIANI AND LAUREL QUINTILIANI,

Consolidated Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER CORPORATION,

Defendant-Third-Party-Plaintiff Appellee,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e: FEINBERG, WINTER, and STRAUB, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of Connecticut (Dorsey, J.) entered in a third-party action for indemnity, following an accident in which a train owned and operated by defendant-third-party-plaintiff appellee Amtrak caused the death of one employee of third-party-defendant appellant O&G Industries, Inc. and injured another. In the first instance, the district court (1) granted summary judgment to Amtrak on the ground that the indemnity agreement between Amtrak and O&G was not invalid under Connecticut General Statute § 52-572k(a), because the latter is preempted by 49 U.S.C. § 28103(b), which allows rail passenger carriers to enter into indemnification agreements concerning claims brought against them; and (2) held that O&G was required, as a matter of law, to indemnify Amtrak for the liabilities and costs

Amtrak incurred in the tort actions arising out of the accident, despite a jury verdict that O&G was relieved of this obligation because Amtrak's failure to adequately protect O&G workers amounted to a material breach of the contract between them. We now affirm the rulings of the district court. We also find that any error the district court committed by precluding appellant from cross-examining an employee of the appellee in the first phase of the trial (concerning the tort actions against Amtrak) and subsequently restricting appellant's direct examination of the same employee in the second phase of the trial (concerning the indemnity claim against O&G) was harmless. Finally, we dismiss for want of appellate jurisdiction O&G's challenges to the award of attorneys' fees and costs. Dismissal does not affect our jurisdiction to review the merits of the other issues on appeal. Affirmed in part and dismissed in part.

> KIMBERLY A. KNOX (Michael S. Taylor and Brendon P. Levesque, on the brief), Horton Shields & Knox, P.C., Hartford, Connecticut, and Jeffrey A. Blueweiss (on the brief), Bai, Pollock, Blueweiss & Mulcahey, Shelton, Connecticut, for Third-Party-Defendant Appellant.

> WILLIAM G. BALLAINE (Dawn Pinkston, of counsel, on the brief), Landman Corsi Ballaine & Ford, P.C., New York, New York, for Defendant-Third-Party-Plaintiff Appellee.

FEINBERG, Circuit Judge:

This case is procedurally complicated. The present appeal arises out of a third-party complaint brought by National Railroad Passenger Corporation (hereafter "Amtrak" or "appellee") against O&G Industries, Inc. (hereafter "O&G" or "appellant") in the United States District Court for the District of Connecticut (Dorsey, J.). In its complaint, Amtrak sought indemnification from O&G for any liabilities and costs, including attorneys' fees, that Amtrak would

incur in two consolidated tort actions against it for wrongful death and personal injury damages resulting from a train accident.[1]

The proceedings in the district court included two rulings that O&G now appeals to this Court. First, before trial of the third-party indemnity action began, the district judge granted partial summary judgment to Amtrak on the basis of an explicit indemnity provision in a right-of-access contract between Amtrak and O&G. The court upheld the validity of the indemnity provision, ruling that 49 U.S.C. § 28103(b) (hereafter "§ 28103(b)") -- which allows rail passenger carriers to enter into liability-shifting agreements -- preempted Connecticut General Statute § 52-572k(a) (frequently referred to hereafter as the "Connecticut statute"). That statute prohibits, on public policy grounds, indemnity agreements entered into in connection with construction contracts, if they purport to shield the indemnitee from liability for its own negligence. O&G invoked the Connecticut statute to defeat Amtrak's indemnity claim. See Roberts v. Nat'l R.R. Passenger Corp. v. O&G Indus., Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006 WL 648212 (D. Conn. Mar. 9, 2006).

---

[1] The two actions were Roberts v. Nat'l R.R. Passenger Corp., No. 3:04-cv-1318 (D. Conn. filed Aug. 9, 2004), and Quintiliani v. Nat'l R.R. Passenger Corp., No. 3:04-cv-2195 (D. Conn. filed Dec. 29, 2004). A third action was brought against Amtrak by the Hartford Fire Insurance Company, as subrogee of O&G, for damage to O&G property caused by the train accident. See Hartford Fire Ins. Co. v. Nat'l R.R. Passenger Corp., No. 3:04-cv-1622 (D. Conn. filed Sept. 28, 2004). This action was settled and is not part of the present appeal.

Second, the judge granted Amtrak's post-trial motion for judgment as a matter of law, setting aside a jury verdict that O&G was relieved of its obligation to indemnify Amtrak because of Amtrak's material breach of the contract with O&G. Judge Dorsey held that Amtrak's contractual default did not affect the validity of the indemnity agreement, which explicitly covered accidents attributable to Amtrak's negligence. See Roberts v. Nat'l R.R. Passenger Corp. v. O&G Indus., Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006 WL 2621733 (D. Conn. Sept. 12, 2006).

O&G argues on appeal that the district court erred in (1) granting partial summary judgment to Amtrak; (2) entering judgment for Amtrak as a matter of law; (3) curtailing O&G's cross- and direct examination of an Amtrak employee during the trial; and (4) awarding Amtrak attorneys' fees and defense costs without any evidence as to their amount and reasonableness.

On the first and second of these issues, we affirm the district court. On the third, we find the limitations of O&G's cross-examination rights by the district court, even if erroneous, were not substantially prejudicial to appellant. On the fourth issue, we conclude that we lack appellate jurisdiction over the district court's non-final award of attorneys' fees and costs.

**I.    BACKGROUND**

4

The accident that led to this litigation occurred in June 2004, while Gregory Roberts and Peter Quintiliani, carpenters employed by O&G, were installing wood planks on the underside of a highway bridge suspended over Amtrak's tracks in East Haven, Connecticut. An Amtrak diesel locomotive entered their worksite without warning and collided with the man-lift in which they were stationed. Amtrak's on-site safety personnel were unable to prevent the accident, because they were unaware of the train's scheduled passage through O&G's work area, due to poor coordination with the office of Amtrak's chief dispatcher in Boston. Furthermore, Amtrak's employees, having already de-energized the tracks at the East Haven worksite so that no electric-powered train could pass, erroneously believed that the tracks had been placed out of service. Thus, they had not made a specific request to "foul" the tracks, i.e., render them completely inoperable until O&G's crew had completed its work. At the time of the accident, therefore, none of O&G's or Amtrak's employees on duty at the site expected any train movement through the work zone.[2] The collision killed Roberts instantly; Quintiliani was injured while jumping out of the lift.

---

[2]     A more detailed description of the train accident can be found in the district court's March 2006 ruling on the parties' motions for summary judgment. See Roberts v. Nat'l R.R. Passenger Corp. v. O&G Indus., Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006 WL 648212 (D. Conn. Mar. 9, 2006), 2006 WL 648212, at *1-3. We think it unnecessary to recount here all the factual circumstances surrounding the accident, because the crux of the dispute before us is Amtrak's indemnity claim against O&G -- not responsibility for the accident, which Amtrak admitted at trial.

David Roberts (hereafter "Roberts"), the brother of the deceased O&G employee and administrator of his estate, filed in August 2004 a wrongful death action against Amtrak, seeking compensatory and punitive damages. The suit by Roberts was consolidated with Quintiliani's personal injury action. After answering the two actions, Amtrak filed its third-party complaint against O&G.

The indemnity claim was based on a clause in the "Temporary Permit to Enter Upon Property" (hereafter "Permit"), a contract concluded between O&G and Amtrak in October 2003. Under the Permit, Amtrak allowed O&G access to Amtrak's property in East Haven, in order to perform construction work in relation to O&G's contract with the Connecticut State Department of Transportation regarding the re-building of a stretch of Interstate 95 between New Haven and Branford, Connecticut; consideration was $1. O&G, on its part, undertook to "use all necessary care and precaution to avoid accidents, delay or interference with [Amtrak's] trains or property" and abide by Amtrak's safety regulations. Pursuant to the Permit, Amtrak would provide, at its discretion and at O&G's expense, "flag service and/or other protection" necessary to maintain the "safety and continuity of railroad traffic," over which Amtrak retained exclusive control. However, the provision of "protective services" would "not relieve [O&G] from [its] complete responsibility for the

adequacy and safety of [its] operations." A key feature of the Permit is the following provision:

> The Permittee [O&G] shall defend, indemnify and hold harmless Railroad [Amtrak], its officers, directors, employees, agents, servants, successors, assigns and subsidiaries, <u>irrespective of their negligence or fault</u>, from and against any and all losses and liabilities, . . . claims, causes of action, suits, costs and expenses incidental thereto (<u>including cost of defense and attorney's fees</u>), which any or all of them may hereafter incur, be responsible for, or pay as a result of injury, [or] death, . . . to any person . . . arising out of or . . . resulting from activities of or work performed by [O&G], its officers, employees, agents, servants, contractors, subcontractors, or any other person acting for or by permission of [O&G]. <u>The foregoing obligation shall not extend to situations where the negligence or fault of Amtrak, its officers, directors, [or] employees . . . is the sole causal negligence or fault, except that it shall so extend to injury [or] death . . . to employees of [O&G], its agents, servants, contractors, subcontractors, or any other person acting for or by permission of [O&G].</u> The foregoing obligation shall not be limited by the existence of any insurance policy or by any limitation on the amount or type of damages, compensation, or benefits payable by or for [O&G] or any contractor or subcontractor, and shall survive the termination of this permit for any reason.

(Emphasis added.) In the district court, O&G argued that the above provision was invalid under Connecticut General Statute § 52-572k(a), which declares void as against public policy agreements to indemnify a party against its own negligence, if such agreements were made "in connection with or collateral to" construction contracts.

Before trial began on Amtrak's indemnity claim, Amtrak sought summary judgment and orders directing O&G to defend Amtrak in the two tort actions and reimburse Amtrak's reasonable attorneys' fees in defending against those claims. In March 2006, Judge Dorsey

7

granted Amtrak partial summary judgment, concluding that § 28103(b), which allows Amtrak to enter into indemnification agreements as to claims against it, preempted the Connecticut statute and allowed Amtrak to pursue its indemnity claim at trial.

The jury trial of the consolidated actions by plaintiffs Roberts and Quintiliani against Amtrak began in March 2006. The first phase ("Phase I") was limited to the issue of damages to be awarded to plaintiffs. Amtrak conceded negligence (but not recklessness). In April 2006, the jury awarded plaintiffs $1.425 million each in compensatory damages, but rejected the punitive damages claims, finding that Amtrak's conduct was not willful or reckless.[3] At the end of the second phase of the trial ("Phase II") concerning Amtrak's third-party complaint against O&G, the jury found that O&G was excused from its obligation to indemnify Amtrak, because Amtrak's failure to provide O&G's crew adequate on-site protection amounted to a material breach of the Permit, rendering it void in its entirety.

After this second verdict, Amtrak moved for judgment as a matter of law, under Federal Rule of Civil Procedure 50(b), arguing that there were no triable issues of fact as to the applicability of the indemnity clause in the Permit and, hence, O&G was required to

---

[3] The Roberts estate appealed from the judgment of the district court entered against Amtrak after the verdict. That appeal was heard by this panel the same day as the appeal now before us. In November 2007, we summarily affirmed the judgment of the district court. See Roberts v. Nat'l R.R. Passenger Corp., No. 06-3036-cv, 2007 WL 3230736 (2d Cir. Nov. 1, 2007) (summary order).

indemnify Amtrak for litigation costs and damages awarded in the underlying actions by Quintiliani and Roberts. In the alternative, Amtrak sought a new trial, under Rule 59(a), on whether a material contractual default nullified the entire Permit.

In September 2006, the judge granted Amtrak's Rule 50(b) motion, concluding that Amtrak's right to indemnity explicitly accrues, under the Permit, where Amtrak is found liable for injury to or death of an O&G employee solely caused by Amtrak's own negligence or fault. See Roberts, 2006 WL 2621733, at *5-6. Allowing O&G to evade its indemnity obligations because of Amtrak's negligence, the court reasoned, would "render the indemnification provision meaningless." Id. at *6.

In December 2006, the court entered judgment in favor of Amtrak in its indemnity action against O&G. This timely appeal by O&G followed.

**II. DISCUSSION**

The parties to this appeal raise several issues. First, we must decide whether the Connecticut statute, which nullifies indemnity agreements insulating a contracting party from its own negligence,[4]

---

[4] Connecticut General Statute § 52-572k states:

> (a) Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the

applies, on its face, to the Permit; if it does, we must next examine whether § 28103(b), which permits Amtrak to enter into indemnification agreements,[5] preempts the Connecticut statute. Second, in considering the district court's grant of Amtrak's motion for judgment as a matter of law, we must assess whether Amtrak's conceded failure to effectively protect O&G's crew constituted a material breach of the Permit, discharging O&G from its indemnity obligation. Third, we review the district court's decision to preclude O&G from cross-examining an Amtrak employee during Phase I of the trial, and the judge's subsequent decision to restrict O&G's direct examination of the same employee during Phase II. Finally, we consider whether we have jurisdiction over the district court's non-quantified award to Amtrak of reasonable costs and attorneys' fees incurred in the defense of the Roberts and Quintiliani actions.

## A. **Preemption**

Our review of a grant of summary judgment under Rule 56 is plenary. "[S]ummary judgment is appropriate where there exists no

---

promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

[5] 49 U.S.C. § 28103(b) provides:

A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims.

10

genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). We view the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in its favor. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006).

### 1)    *Applicability of the Connecticut Statute*

In its appeal, O&G relies heavily on the Connecticut statute. In response, Amtrak claims for the first time that the Connecticut statute does not apply to the Permit because it allegedly bars indemnity agreements only if inserted in construction contracts. Amtrak argues that the Permit was not such a contract. In the district court, however, Amtrak did not contest the applicability of the Connecticut statute, although it had ample opportunity to do so. Under the circumstances, Amtrak has waived that argument and cannot raise it on appeal. See Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994) (citing Singleton v. Wulff, 428 U.S. 106, 120 (1976)).[6] Therefore, we proceed with the preemption question on the

---

[6]    Our refusal to consider Amtrak's waived argument on the applicability of the Connecticut statute is of little importance to the final disposition of the case. As set forth below, we agree with the district court's finding that the Connecticut statute is preempted by federal law and thus does not invalidate the indemnity clause in the Permit.

assumption that the Connecticut statute applies, unless it is preempted.

### 2) Preemption by § 28103(b)

Section 28103 of Title 49 of the United States Code was enacted as part of the Amtrak Reform and Accountability Act of 1997 (hereafter the "Reform Act"). Subsection (b) of § 28103 provides that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims." Amtrak argues that this subsection was intended to allow it to enter into enforceable indemnity agreements not voidable under state law. In Amtrak's view, § 28103(b) is at odds with and preempts the Connecticut statute.

O&G counters that § 28103(b) applies only to indemnity agreements (1) regarding claims brought by passengers and (2) concluded between passenger rail carriers like Amtrak and freight railroads. Because Gregory Roberts and Quintiliani were not Amtrak passengers, and the indemnity agreement was between Amtrak and O&G, a construction company rather than a freight railroad company, O&G maintains that § 28103(b) is not applicable and does not supersede the Connecticut statute. In support of its arguments, O&G points to subsection (a) of § 28103, which governs the issue of punitive damages to be awarded in relation to passenger claims for personal

injury, wrongful death or property damage,[7] and to the legislative history of § 28103(b).

Federal preemption of state law is a doctrine grounded in the Supremacy Clause of the Constitution. See U.S. Const. Art. VI, cl. 2 ("[T]he Laws of the United States . . . made in Pursuance [of the Constitution] shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). The doctrine requires us first to ascertain congressional intent, which is "'the ultimate touchstone' of pre-emption analysis." See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quoting Malone v. White Motor Corp., 435 U.S. 497, 504 (1978)). Intent to preempt state law may be found "(1) where Congress expressly states its intent to preempt; (2) where Congress's scheme of federal regulation is sufficiently

_____

[7] That subsection provides:

(a) Limitations.
--(1) Notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to damages or liability, in a claim for personal injury to a passenger, death of a passenger, or damage to property of a passenger arising from or in connection with the provision of rail passenger transportation, . . . punitive damages, to the extent permitted by applicable State law, may be awarded in connection with any such claim only if the plaintiff establishes by clear and convincing evidence that the harm that is the subject of the action was the result of conduct carried out by the defendant with a conscious, flagrant indifference to the rights or safety of others. If, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, this paragraph shall not apply.
(2) The aggregate allowable awards to all rail passengers, against all defendants, for all claims, including claims for punitive damages, arising from a single accident or incident, shall not exceed $200,000,000.

13

comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law actually conflicts with federal law." Marsh v. Rosenbloom, 499 F.3d 165, 177 (2d Cir. 2007) (citing Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280 (1987)).

As the district court correctly concluded, § 28103(b) does not expressly preempt state law, nor is it "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." Roberts, 2006 WL 648212, at *10. Preemption can thus be found here only if the Connecticut statute conflicts with § 28103(b), i.e., if compliance with both statutes is impossible, or if the Connecticut statute "'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.'" United States v. Locke, 529 U.S. 89, 109 (2000) (quoting California v. ARC Am. Corp., 490 U.S. 93, 100-101 (1989)).

O&G first contends that no irreconcilable conflict exists between the federal and the Connecticut statutes, because Congress intended § 28103(b) to apply only to passenger claims. The argument is unavailing. The subsection contains no such limitation on its face and indeed makes plain that Amtrak may enter into contracts allocating financial responsibility (i.e., indemnity agreements) for any claims brought against it.

Furthermore, if Congress intended § 28103(b) to apply only to passenger claims, it would have included such qualifying language in

14

the definition of the term "claims." Congress did not do so. The definition in subsection (e) of § 28103 is sufficiently broad to encompass any claims asserted against Amtrak -- not only those by passengers.[8] Subsection (e) defines the persons or entities *against* whom a claim may be pursued, but does not limit the class of claimants. Because the language is unambiguous on this point, we cannot "supply that which is omitted by the legislature." Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 127 (2d Cir. 2003).

The title of § 28103 -- "Limitations on rail passenger transportation liability" -- is of little aid to O&G's proposition that the statute covers only passenger claims. "[A] title . . . cannot limit the plain meaning of unambiguous text." Collazos v. United States, 368 F.3d 190, 196 (2d Cir. 2004)(omission in original) (internal quotation marks omitted).

We conclude that § 28103(b), read in the context of the whole section, see Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000), authorizes Amtrak's entry into indemnification agreements for any claim filed against it, including

---

[8]    49 U.S.C. § 28103(e) states:

> Definition.-- For purposes of this section --
> (1) the term "claim" means a claim made--
> (A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or
> (B) against an officer, employee, affiliate engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State.

15

tort claims by contractor employees. This permissive mandate can hardly be reconciled with the prohibition of the Connecticut statute.

O&G also argues that the scope of § 28103(b) only extends to indemnity agreements between Amtrak and the freight railroad companies that own most of the rail lines on which Amtrak operates and are reluctant to shoulder liabilities stemming from the use of their tracks by passenger trains. This claim is equally unpersuasive because of the unambiguous text of § 28103(b) for the reasons set forth above, and we rest our conclusion that § 28103(b) preempts the Connecticut statute on that ground.

Nonetheless, O&G's argument that congressional intent, as evidenced by the legislative history of § 28103(b), counsels a different result is meritless. Because Amtrak is a passenger rail provider mostly operating on track systems owned by freight railroads, the protection afforded by § 28103(b) will most likely apply to indemnity agreements with freight railroads. As a result, many of the congressional sponsors of the Reform Act frequently referred in their discussions to the liability allocation agreements between Amtrak and host freight railroads. That said, we find no evidence of congressional intent that § 28103(b) apply <u>only</u> in that particular set of circumstances. Rather, the goal of the Reform Act was to shield <u>all</u> of Amtrak's indemnity arrangements from legal attacks on their validity. <u>See</u> <u>Symposium: The State of the Law in</u>

16

the Railroad Indus., 26 Transp. L.J. 319, 336-37 (1999) ("Congress . . . encouraged all providers of rail passenger transportation to enter into contracts that allocate financial responsibility for claims. Resolving an issue that had plagued freight railroads that host Amtrak trains, Congress also affirmed the enforceability of contracts that include indemnification obligations.").

The legislative history of § 28103(b) is illuminating. Congressional debates reveal legislative concern about Amtrak's financial problems and intention to support Amtrak's contractual arrangements designed to reduce its liability exposure. The Reform Act was meant, among other things, to ensure the enforceability of indemnity agreements Amtrak concludes with any other party. The Senate Committee Report is categorical in that regard:

> [T]his bill clarifies that indemnification agreements related to the provision of rail passenger service entered into by Amtrak and other parties would be enforceable. The Committee has been requested by Amtrak to include this provision in order to aid Amtrak in achieving operating self-sufficiency. . . . As long as there is the possibility that state laws governing indemnification contracts may make these contracts unenforceable, Amtrak and a freight railroad may find themselves litigating with each other. Amtrak believes that such litigation inevitably would not only adversely impact business relationships between Amtrak and the host freight railroads, but it would also lead to significantly higher outlays in settlements and judgments to plaintiffs.

S. Rep. No. 105-85, at 5 (1997) (emphasis added). Congress unmistakably intended "[t]he language in section 28103(b) . . . to confirm that such contractual agreements [i.e. indemnification

17

agreements] are consistent with Federal law and public policy." 143 Cong. Rec. S11937-03 (statement of Sen. Lott). O&G's interpretation of the statute's legislative history would be inconsistent with the stated objective of § 28103(b) to solidify the enforceability of Amtrak's liability-shifting arrangements.

When the Reform Act was passed, Amtrak was in the middle of "a financial crisis, with growing and substantial debt obligations severely limiting its ability to cover operating costs and jeopardizing its long-term viability." Amtrak Reform and Accountability Act of 1997, §2(2), Pub. L. No. 105-134, December 2, 1997, 111 Stat. 2570, at *2571; see also 143 Cong. Rec. S11929-03 (statement of Sen. McCain) ("Amtrak is on the verge of bankruptcy. Fundamental reforms are needed immediately if there is to be any possibility of addressing Amtrak's financial crisis and turning it into a viable operation."). The Reform Act clearly reflects Congress's distress over Amtrak's financial burdens: in 49 U.S.C. § 28103(a), Congress limited the award of punitive damages, in actions "arising from . . . the provision of rail passenger transportation," to cases where the defendant was proven to have "a conscious, flagrant indifference to the rights or safety of others." 49 U.S.C. § 28103(a)(1). In a similar vein, Congress placed a $200 million cap on Amtrak's aggregate liability from any single accident. Id. § 28103(a)(2).

18

Against this legislative background, contentions that Congress intended to allow state law or public policy to interfere with Congress's attempt to rescue Amtrak are simply not persuasive. We believe that we must enforce and recognize the validity of the indemnity provision in the Permit. Applying the Connecticut statute would violate the plain language and spirit of § 28103(b), which therefore preempts the Connecticut statute.

**B.    Material Breach of the Permit**

At the conclusion of Phase II of the trial, the jury found that, under the indemnity provision in the Permit, O&G was required to reimburse Amtrak for costs incurred and damages awarded in the Roberts and Quintiliani actions, but that Amtrak's material breach of the Permit relieved O&G of all its contractual duties, including the obligation to indemnify Amtrak. However, the district judge overturned the jury verdict, ruling that as a matter of law O&G's contractual obligation to indemnify Amtrak was valid regardless of Amtrak's negligence. See Roberts, 2006 WL 2621733, at *5-7. O&G now challenges this ruling, arguing that the jury properly found that Amtrak's violation of its duty to protect O&G's workers from passing trains resulted in termination of the entire Permit and O&G's indemnity obligation thereunder. We review de novo the district court's grant of a post-verdict judgment to Amtrak as a matter of law, considering the evidence in the light most favorable to O&G,

19

the nonmoving party. Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007).

"[A] material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." 23 Williston on Contracts § 63:3 (4th ed. 2007) (footnotes and internal quotation marks omitted). Under Connecticut law, an uncured, material failure of performance by one contracting party discharges the other party from any further performance under the contract, which is rendered unenforceable in toto. See Bernstein v. Nemeyer, 570 A.2d 164, 168 (Conn. 1990).

It is uncontroverted that O&G complied with its obligations under the Permit to perform its work on Amtrak's property so as to observe Amtrak's safety regulations and not "interfere with [Amtrak's] operations." By contrast, Amtrak's failure to provide adequate protection to O&G's workers, O&G claims, negated the Permit's purpose and amounted to a material breach. The district court rejected this claim because of the unambiguous language of the indemnity agreement, which the court held squarely applicable to the undisputed facts of the case. See Roberts, 2006 WL 2621733, at *6 ("The argument lacks merit, however, because the factual situation on which O&G relies for being excused from its obligation is exactly the factual situation which gives rise to that obligation.").

20

We agree with the district judge's holding. Not only is the indemnity clause not qualified by or conditioned on Amtrak's obligation to operate its trains safely through the worksite, but it explicitly provides Amtrak with a right to indemnity even where "the negligence or fault of Amtrak [or] its . . . employees" is the sole cause of "injury, death, disease, or occupational disease to employees of" O&G.[9] O&G cannot circumvent its indemnity obligation by invoking Amtrak's negligence, which the parties envisaged and clearly determined would *not* exonerate O&G from its contractual duties. As Judge Dorsey emphasized, if O&G is allowed to evade its obligation to hold Amtrak harmless, "Amtrak's protection against ultimate responsibility for any unsafe train operation, as provided in the Permit, would be nullified." Id. at *6. Since the indemnity provision expressly contemplates the factual situation that arose here (i.e., Amtrak's negligence was the sole cause of injury and death to O&G's employees), Amtrak's failure to safely operate its trains through O&G's work zone could not have thwarted the Permit's essential purpose.

A reading of the Permit as a whole suggests, in fact, that at the core of the agreement was the parties' preoccupation with the "safety and continuity of railroad traffic," rather than the safety of O&G's personnel. The emphatic references to O&G's undertaking to take all measures necessary to avoid undue interference with train

_____

[9] The indemnity provision is quoted in full in section I of the opinion, see supra at p.__. Its applicability in this case has not been called into question by the parties.

21

operations and its "complete responsibility for the adequacy and safety of" its activities suggest that the Permit was drafted with a principal focus on Amtrak's interests. Even Amtrak's promise to furnish protection was aimed at ensuring the safety and continuity of railroad traffic and would come into play only if, in the opinion of Amtrak's officers, "conditions warrant" it, and under the condition that O&G would bear all the costs. It is a fair inference that the essential purpose of the Permit was not to guarantee the safety of O&G's employees, but rather to authorize O&G's temporary access to Amtrak's property while reassuring Amtrak that O&G's presence on its property would neither disrupt train operations nor damage Amtrak's trains and facilities. Amtrak's negligent failure to provide adequate protection to O&G's workers did not vitiate this purpose.

O&G does not claim that every negligent act by Amtrak would constitute a material breach of the Permit. According to O&G, there could be situations involving negligent acts by Amtrak representatives that, nevertheless, would be covered by the indemnity provision without necessarily amounting to a breach of a fundamental contractual term. For example, O&G claims, "an Amtrak employee could accidentally strike someone with a tool or a piece of equipment, or could dig a hole into which an individual might fall." See Br. of Appellant at 36.

The breadth of the indemnity provision refutes the distinction O&G seeks to introduce. The provision does carve out of its reach some situations where Amtrak's negligence is the sole cause of the indemnifiable loss, but O&G's obligation to indemnify Amtrak explicitly extends to instances of "injury, death, disease, or occupational disease to employees of [O&G]" exclusively caused by Amtrak's negligence or fault. If Amtrak's obligation to protect O&G's employees were a centerpiece of the Permit, and default of this obligation were intended to invalidate the Permit in its entirety, the parties could have made this clear by, for example, including a termination clause in the Permit. Absent any stipulation or indication to that effect, we cannot "unmake" the bargain the parties struck, "whether provident or improvident." Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P., 746 A.2d 1277, 1292 (Conn. 2000) (internal quotation marks omitted). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." Pesino v. Atl. Bank of New York, 709 A.2d 540, 545 (Conn. 1998) (internal quotation marks omitted). Under the circumstances of this case, a finding of material breach of the Permit would be incompatible with its plain language.

"Simply stated, . . . the evidence [here] is such that, without . . . considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have

23

reached." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970). Accordingly, we affirm the district court's grant of judgment to Amtrak as a matter of law and hold that, regardless of Amtrak's negligence in causing the accident, O&G bears the valid obligation to indemnify Amtrak for the damages awarded to Quintiliani and Roberts.

**C.    Cross-Examination of Amtrak's Employee by O&G**

The district court permitted O&G to participate in Phase I of the trial, in which plaintiffs Roberts and Quintiliani sued defendant Amtrak. The judge's rationale was that evidence presented in relation to plaintiffs' claims against Amtrak might well bear on Amtrak's indemnity claim against O&G. Nevertheless, the judge did not permit O&G's counsel to cross-examine Amtrak's New England Division Superintendent Fred Fournier. O&G's stated reason for cross-examining Fournier was to elicit testimony tending to prove that O&G was not at fault for the accident, which was entirely attributable to Amtrak's reckless conduct. O&G argues that a showing of Amtrak's recklessness would enable O&G to avoid its indemnity obligations on public policy grounds. Judge Dorsey's reasoning for denying O&G's request to cross-examine Fournier was that issues pertaining to O&G's role in the accident would be addressed in Phase II. O&G was told that it would have ample opportunity to present its recklessness defense at that time. However, when O&G attempted to

24

question Fournier in Phase II of the trial about whether Amtrak followed proper internal procedures to avert safety risks to O&G's on-site employees, the court sustained Amtrak's objection to this line of questioning. The judge noted that the jury had already resolved the issue of Amtrak's fault in Phase I of the trial.

O&G now claims that by precluding its cross-examination of Fournier in Phase I and limiting its questioning of the same witness in Phase II of the trial, the district judge prevented O&G from fully litigating the question of Amtrak's recklessness -- on which one of O&G's defense was premised -- and thus deprived it of its cross-examination rights. The error, according to O&G, warrants a new trial.

As a preliminary matter, we reject Amtrak's contention that this claim has not been preserved for appellate review. O&G repeatedly objected to the court's limitations on its examination of Fournier, articulating the concern that, if the jury found no recklessness by Amtrak in Phase I, that issue would be barred from jury consideration in Phase II.

We turn to the merits of O&G's claim. "Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'" See Tesser v. Bd. of Educ., 370 F.3d 314, 319 (2d Cir. 2004) (per curiam) (quoting Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993)); see also Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error . . . by

the court . . . is ground for granting a new trial, . . . or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.")

We believe that the court's alleged error did not have a substantial impact on the outcome of the case. O&G's interests were adequately protected by Roberts and Quintiliani, the plaintiffs in Phase I. These parties were seeking punitive damages from Amtrak and thus had an equal, if not greater, incentive than O&G to show that Amtrak's conduct was reckless. The question of Amtrak's recklessness was adequately litigated by Roberts and Quintiliani and there is no indication that the jury would have found recklessness, had O&G been allowed to cross-examine Fournier. The limitation of O&G's cross-examination rights, even if erroneous, did not cause any prejudice to O&G, because "it is [not] likely that in some material respect the factfinder's judgment was swayed by the error." Tesser, 370 F.3d at 319 (internal quotation marks omitted). See also United States v. Thomas, 274 F.3d 655, 668 (2d Cir. 2001) (en banc) ("An error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings") (internal quotation marks omitted).

Furthermore, even supposing the district judge had not restricted O&G's examination of Fournier in Phase I, and that O&G had convinced the jury that Amtrak's conduct was reckless, it is

doubtful that the outcome of the case would have been more favorable to O&G. The indemnity provision in the Permit unequivocally requires O&G to reimburse Amtrak for <u>all</u> the losses Amtrak may sustain as a result of death or injury to O&G's employees, even when Amtrak's own negligence <u>or fault</u> is the sole cause of the incident. The unmistakable wording of the clause would thus not allow O&G to nullify its obligation to indemnify Amtrak, even if the jury had entered a punitive damages award against Amtrak on recklessness grounds.

O&G argues to us that, had it been allowed to fully participate in Phase I of the trial, and had the jury found Amtrak's conduct reckless, O&G would have been relieved of its duty to hold Amtrak harmless, by raising a public policy defense against enforcement of the indemnity agreement. We disagree. We have already held in this opinion (<u>see</u> Part II.A, <u>supra</u>) that the Connecticut statute embodying the public policy of Connecticut against indemnification for liabilities due solely to the negligence of the indemnitee[10] is preempted by § 28103(b). Subsection § 28103(b) also superseded the opinion that would have been most helpful to O&G in its public policy defense against indemnification for reckless conduct. <u>See Nat'l R.R. Passenger Corp. v. Consol. Rail Corp. ("ConRail")</u>, 698 F. Supp. 951 (D.D.C. 1988) (invalidating an agreement to indemnify for losses caused by the indemnitee's gross negligence, as contrary to District of Columbia public policy), <u>vacated on other grounds</u>, 892

---

[10]    See <u>supra</u> note 3.

F.2d 1066 (D.C. Cir. 1990). As Judge Dorsey correctly noted in granting summary judgment to Amtrak, it was precisely the doubts cast by the ConRail decision over the validity of indemnity agreements by railroad parties that prompted Congress to enact § 28103(b). See Roberts, 2006 WL 648212, at *11. The broad, unqualified language in § 28103(b) leaves no doubt as to the specific intent of Congress to sanction indemnity arrangements between Amtrak "and other parties" with respect to any claims against Amtrak. See S. Rep. No. 105-85, at 5 (1997). A finding of recklessness in Phase I, therefore, would have resulted in a higher jury verdict against Amtrak in the underlying actions against it in Phase I of the trial. This would most probably have permitted Amtrak to obtain greater recovery from O&G under the Permit; public policy considerations would not have precluded enforcement of the express direction of the indemnity provision.

In view of the above, we hold that, assuming arguendo that the district judge erred in preventing O&G from cross-examining Fournier in Phase I and from fully pursuing its recklessness defense in Phase II, the error was not prejudicial to O&G in the context of the trial as a whole and does not justify a new trial.

**D.  Attorneys' Fees**

In granting Amtrak's Rule 50(b) motion for judgment as a matter of law, the district judge held that, under the indemnity

agreement, Amtrak was entitled to reimbursement of its attorneys' fees, as well as the costs it incurred in Phase I of the trial, in defense of the actions brought by Roberts and Quintiliani. The judge, however, did not set the amount of attorneys' fees and litigation costs for which O&G was required to indemnify Amtrak. O&G now argues that the district court abused its discretion in awarding attorneys' fees and costs where there was no evidence as to the amount or reasonableness of these expenses. Amtrak responds that the amount of fees due would be ascertained by the district judge only after liability for such fees was determined.

Pursuant to 28 U.S.C. § 1291, we review only final decisions of the district court that "leave[] nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233 (1945). A non-quantified award of attorneys' fees and costs is not appealable until the amount of the fees has been set by the district court. "We have held that where attorneys' fees are a contractually stipulated element of damages, a judgment is not final until the fees have been determined." F.H. Krear & Co. v. Nineteen Named Trustees, 776 F.2d 1563, 1564 (2d Cir. 1985) (per curiam); see also Honeywell Int'l, Inc. v. Purolator Prods. Co., 468 F.3d 162, 164 (2d Cir. 2006). This circuit, moreover, has "rejected the doctrine of pendent appellate jurisdiction as a basis to review an undetermined award of attorneys' fees, even when the question of liability for the fees had been consolidated with other decisions that were

final." Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 87 (2d Cir. 1998) (citing Cooper v. Salomon Bros., 1 F.3d 82, 85 (2d Cir. 1993)). We therefore dismiss for lack of appellate jurisdiction the portion of O&G's appeal challenging the district court's grant of attorneys' fees and costs incurred in Phase I of the trial.

This defect does not impair the finality of the district court's ruling on Amtrak's motion for judgment as a matter of law, nor does it divest us of jurisdiction to review the merits of the other issues on appeal. In reaching this conclusion, we apply the "bright-line rule" enunciated by the Supreme Court in Budinich v. Becton Dickinson & Co., 486 U.S. 196 (1988), "that a decision on the merits is a 'final decision' for purposes of [28 U.S.C.] § 1291 whether or not there remains for adjudication a request for attorney's fees." Id. at 202-03.[11]

**III. CONCLUSION**

---

[11] Some of our pre-Budinich precedent might be read to support the proposition that the non-finality of an award of attorneys' fees sought as an element of contractual damages renders non-appealable the entire judgment in which such award is incorporated. See, e.g., Union Tank Car Co. v. Isbrandtsen, 416 F.2d 96 (2d Cir. 1969) (per curiam). However, we heed the Supreme Court's admonition in Budinich that "no interest pertinent to § 1291 is served by according different treatment to attorney's fees deemed part of the merits recovery," and abide by the now "uniform rule that an unresolved issue of attorney's fees . . . does not prevent judgment on the merits from being final." Budinich, 486 U.S. at 202. Application of this sensible rule also promotes the interests of judicial economy, especially in this case where resolution of the "question remaining to be decided . . . will not alter . . . or revise" the court's final rulings on the merits of the other issues on appeal. Id. at 199. Treating the district court's grant of Amtrak's Rule 50(b) motion as non-final and remanding the entire case to the district court would only cause further delays in the disposition of this long-pending case.

We have considered all of appellant O&G's arguments and find them to be without merit. For the reasons discussed above, we affirm the district court on all issues except for the ruling on attorneys' fees, over which we lack appellate jurisdiction. AFFIRMED IN PART AND DISMISSED IN PART.