Richard DEWEESE

v.

**NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK); Southeastern Pennsylvania Transportation Authority; Commonwealth of Pennsylvania Department of Transportation Southeastern Pennsylvania Transportation Authority, Appellant.**

No. 09–1569.

United States Court of Appeals, Third Circuit.

Argued Nov. 2, 2009.

Filed Dec. 22, 2009.

Thomas S. Biemer, [Argued], Matthew A. Foley, Dilworth Paxson, Philadelphia, PA, for Appellant Southeastern Pennsylvania Transportation Authority ("SEPTA").

William G. Ballaine, [Argued], Landman, Corsi, Ballaine & Ford, New York, NY, Paul F.X. Gallagher, Gallagher & Rowan, Philadelphia, PA, for Appellee National Railroad Passenger Corporation.

Before: SCIRICA, Chief Judge, JORDAN and GREENBERG, Circuit Judges.

----

## OPINION OF THE COURT

JORDAN, Circuit Judge.

The Southeastern Pennsylvania Transportation Authority ("SEPTA") appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment to the National Railroad Passenger Corporation ("Amtrak") on its cross-claim against SEPTA. The District Court determined that SEPTA's state-law sovereign immunity defense is preempted by Amtrak's federal enabling statute and that an indemnity contract between SEPTA and Amtrak is therefore enforceable. For the following reasons, we will affirm.

## I. Background

### A. The Accident

This dispute arises out of an accident on October 28, 2004, in which plaintiff Richard Deweese was struck by an Amtrak train. The day of the accident, Deweese was waiting for a Philadelphia-bound SEPTA train at the Crum Lynne, Pennsylvania train station, which is adjacent to tracks used by both Amtrak and SEPTA. Someone at the station told Deweese that the platform from which to board the Philadelphia-bound trains was located on the opposite side of the tracks. Rather than using the stairs available to him to safely cross to the other side, Deweese took it upon himself to descend from the platform and walk directly across the tracks. While doing so, he was struck by an oncoming Amtrak train. Deweese filed suit in state court against Amtrak, SEPTA, and the Commonwealth of Pennsylvania to recover damages resulting from injuries he sustained as a result of the accident. Amtrak removed the action to federal court, and the Commonwealth was subsequently dismissed as a defendant. Prior to trial, Deweese settled his claims with SEPTA and Amtrak for $200,000, with each defendant paying Deweese $100,000.[1] The settlement left unresolved Amtrak's cross-claim against SEPTA for contractual in-

----

1. Not knowing the full details of the accident and the railroads' decision to settle with Deweese, a reader may be left bewildered by this brief synopsis, but the underlying lawsuit is irrelevant to the dispute presently before us.

demnity, which was based on two separate indemnity agreements between Amtrak and SEPTA.

## B. The Indemnity Agreements

Amtrak owns the Crum Lynne train station as well as the adjacent tracks. SEPTA leases the station from Amtrak pursuant to a 1987 agreement entitled "Lease Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Authority Covering 47 Commuter Stations in southeastern Pennsylvania" (the "Lease Agreement"). The Crum Lynne station is serviced exclusively by SEPTA, although SEPTA shares use of the railroad tracks with Amtrak pursuant to a 1982 agreement called the "Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Authority for Northeast Corridor Access and Services" (the "NEC Agreement").

Both the Lease Agreement and the NEC Agreement contain indemnity provisions. Section 5 of the NEC Agreement includes a "Risk of Liability" clause stating that,

> SEPTA agrees to indemnify and save harmless Amtrak, its officers, agents, employees, and subsidiaries, irrespective

of any fault of Amtrak or such persons, for all damage or for liability for personal injury or property damage which would not have been incurred but for the existence of the commuter service provided for SEPTA....

(App. at A155.) The Lease Agreement contains similar language.[2]

Relying on both the Lease Agreement and the NEC Agreement, Amtrak, as already noted, filed a cross-claim[3] against SEPTA in the lawsuit that Deweese brought. Amtrak's claim, consistent throughout this litigation, is that SEPTA is obligated to indemnify Amtrak for its settlement payment to Deweese. SEPTA responded by asserting sovereign immunity, stating in its reply to the cross-claim that "[a]ny obligations on SEPTA's part under the applicable [L]ease [A]greement and [NEC Agreement] to indemnify, save and hold harmless AMTRAK from plaintiff's claims are limited, restricted, and conditioned by, and subject to, SEPTA's immunity as a Commonwealth party...."
(App. at A29.)

Amtrak and SEPTA both moved for summary judgment. SEPTA argued in its summary judgment motion that, despite its clear contractual indemnity obligation to Amtrak under the NEC Agreement,[4] it is

---

**2.** Paragraph 25 of the Lease Agreement states the following:

"Lessee shall indemnify, save and hold harmless and defend Lessor ... against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of property of Lessor, Lessee, or of agents, servants, licensees, contractors, invitees or employees of either, or of any other person, and against and from any and all claims and suits for, and any and all liability, loss, or expense arising from or incidental to or in connection with, injury to or death of persons, including agents, servants, contractors, licensees, invitees or employees of Lessor or of Lessee,

or any other person, which such damage, loss, injury or death shall arise in any manner, directly or indirectly, out of or incidental to or in connection with this lease...."
(App. at A133–A134, ¶ 25.)

**3.** The docket entries and the District Court opinion refer to Amtrak's cross-claim as an amended cross-claim. The record, however, does not indicate how Amtrak's cross-claim has been amended. Thus, for ease of reference, we refer to Amtrak's amended cross-claim as simply a cross-claim.

**4.** SEPTA acknowledges that the NEC agreement is applicable to the present action but does not concede the applicability of the Lease Agreement. Argument and analysis in

barred from indemnifying Amtrak because of the sovereign immunity conferred upon it by Pennsylvania state statute, 1 Pa. Cons.Stat. Ann. § 2310 and 42 Pa. Cons. Stat. Ann. § 8521–25.[5] SEPTA conceded that, were it not for its state-law sovereign immunity defense, it would be required under the NEC Agreement to "hold [Amtrak] harmless against plaintiff's claims." (App. at A168.)

In its own motion for summary judgment, Amtrak contended that any state-law sovereign immunity defense proffered by SEPTA is preempted by Amtrak's enabling statute, 49 U.S.C. § 28103, enacted as part of the Amtrak Reform and Accountability Act of 1997 (the "Reform Act"). The Reform Act states, among other things, that "a provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims." 49 U.S.C. § 28103(b). To support its position, Amtrak relied on a recent decision from the United States Court of Appeals for the Second Circuit, *O & G Industries, Inc. v. National R.R. Passenger Corp.*, 537 F.3d 153 (2d Cir. 2008), which held that the Reform Act preempted a Connecticut state statute governing indemnity contracts, to the extent that the two laws conflicted. SEPTA argued in response that Congress, in enacting 49 U.S.C. § 28103, did not intend "to preclude the application of state law on indemnity clauses."[6] (App. at A 185.)

---

the case have thus naturally centered on the NEC Agreement. We too focus on that particular agreement, though our conclusions are equally applicable to the Lease Agreement.

5. SEPTA has not invoked sovereign immunity under the Eleventh Amendment of the United States Constitution; it only invokes sovereign immunity under Pennsylvania state law. *Cf. Cooper v. SEPTA*, 548 F.3d 296, 311 (3d Cir. 2008) (holding that "SEPTA is not entitled to Eleventh Amendment immunity").

6. SEPTA further argued that it lacks the power to contract away its sovereign immunity and that Amtrak's claims do not fall within any of the statutorily enumerated exceptions to that immunity. Amtrak conceded that SEPTA does not have the power to waive its sovereign immunity through contract and, thus, despite the NEC Agreement, did not waive the opportunity to claim immunity. Amtrak instead argued that SEPTA's sovereign immunity confers protection only against claims sounding in tort and that the instant matter, which implicates the NEC Agreement, presents a contract dispute to which sovereign immunity is inapplicable. SEPTA responded that Amtrak was collaterally estopped from litigating the applicability of SEPTA's sovereign immunity to contractual obligations because that issue had been previously adjudicated in SEPTA's favor in a lawsuit called *Apfelbaum v. National R.R. Pass. Corp.*, 2002 WL 32342481 (E.D.Pa. Oct.17, 2002).

Because we hold that § 28103(b) preempts SEPTA's sovereign immunity defense, and that holding wholly disposes of the case, we need not address the parties' arguments as to whether state-law sovereign immunity actually applies to the present action, nor need we address whether Amtrak is collaterally estopped from litigating that issue. *See United States v. Sanchez*, 562 F.3d 275, 279 n. 5 (3d Cir.2009) (court need not decide an issue when there is an alternative and dispositive basis for decision).

Ordinarily, deciding the scope of a statute would be preferable to addressing a conflict between federal and state law. However, we decide this case on preemption grounds because, first, preemption is the basis of decision chosen by the District Court and it is what the parties have emphasized in their briefs; second, the scope of Pennsylvania's statute is an important state-law issue, better addressed by Pennsylvania's courts in the first instance; and, finally, and most importantly, the issues presented in this appeal are not confined to Pennsylvania. As indicated by both the Second Circuit's *O & G Industries* case and the Reform Act's legislative history, there is an inclination for regional rail carriers to seek shelter from liability, despite the contractual obligations they have undertaken. *See infra*, pages 20–21. Thus, because the conflict between federal and state law implicated here is farther reaching than Pennsylvania's sovereign immunity statute, it is appro-

### C. The District Court Opinion

The District Court granted Amtrak's motion for summary judgment and denied SEPTA's, finding that SEPTA's state-law sovereign immunity defense was preempted by the Reform Act under the doctrine of implied conflict preemption. The Court began by noting that Supreme Court precedent dictates a finding of preemption when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes ... of Congress." (App. at A16–A17.) The Court then explained that, because the Reform Act was enacted in part to ensure the enforceability of indemnification agreements between Amtrak and other parties, a state-law sovereign immunity defense stood as an impermissible obstacle to that objective. The Court supported its holding by analogizing to the Second Circuit's reasoning in *O & G Industries*, 537 F.3d at 153, and concluded that, "[t]o the extent that the Pennsylvania sovereign immunity statute conflicts with the Reform Act, it is preempted."[7] (App. at A17.)

### II. Discussion[8]

██ SEPTA presents a two-fold argument, focused on the breadth of the preemption effected by the District Court's decision and what it contends is an improperly retroactive consequence of such preemption in this case. In advancing its argument, SEPTA, recognizing the importance of the Second Circuit's *O & G Industries* opinion in the District Court's analysis, frames its discussion around issues addressed in that opinion and asserts that the District Court failed to account for two critical distinctions between that case and this one. First, SEPTA argues, the Pennsylvania sovereign immunity statute is a law of general applicability, whereas the Connecticut statute preempted in *O & G Industries* was a law specifically enacted to govern the enforceability of indemnification contracts, voiding indemnification agreements to the extent they would cover gross negligence by the party seeking to be indemnified. Thus, SEPTA says, preempting the application of Pennsylvania's statute would result in a dramatically broader application of preemption than occurred in *O & G Industries*.

Second, SEPTA argues that, even if such a broad application of preemption were warranted in general, it cannot be justified in this particular case because allowing preemption here would give retroactive effect to the Reform Act. While the indemnity agreement in *O & G Industries* was implemented after the passage of the Reform Act, the NEC Agreement was executed a decade prior to the passage of the Reform Act. By SEPTA's reasoning, applying the Reform Act to indemnity agreements entered into prior to the enactment of that statute would give the statute an

priate for us to resolve the case on a broader basis.

7. Because the Court found that SEPTA's sovereign immunity defense was preempted by the Reform Act, it did not address whether SEPTA's state-law sovereign immunity defense was valid under Pennsylvania state law, nor did not it discuss whether Amtrak was collaterally estopped from litigating that issue. *See supra*, note 6.

8. Amtrak removed the present action from state court to federal court under 28 U.S.C. § 1441. The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331. Our jurisdiction arises under 28 U.S.C. § 1291. A district court's grant of summary judgment is subject to plenary review. *Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir.2004); *see also Levy v. Sterling Holding Co.*, 544 F.3d 493, 501 (3d Cir.2008) ("We review de novo the grant or denial of summary judgment by a district court.") (citation omitted). More particularly, we also exercise plenary review over a preemption determination, as it is a question of law. *Horn*, 376 F.3d at 166.

impermissible retroactive effect because Congress did not expressly provide for retroactive application.

Amtrak responds that the District Court properly found preemption because "Congressional history makes abundantly clear that [the Reform Act] . . . applies broadly to assure that Amtrak's indemnity agreements with any other party are fully enforceable without regard to any state law or public policy." (Appellee's Ans. Br. at 12.) Amtrak further argues that finding preemption will not, in fact, result in an impermissible retroactive application of the Reform Act because the important event for purposes of a retroactivity analysis is not the parties' execution of the NEC Agreement in 1992 but rather the accrual of Amtrak's right to indemnification for the Deweese claim in 2004, which occurred several years after the Reform Act was passed in 1997.

### A. Preemption

The primary focus of the parties' attention, as it was of the District Court opinion, is whether Pennsylvania's sovereign immunity statute, 1 Pa. Cons.Stat. Ann. § 2310 and 42 Pa. Cons.Stat. Ann. §§ 8521–25, is preempted by Amtrak's federal enabling statute, 49 U.S.C. § 28103.

■ The Supremacy Clause, found in Article VI of the United States Constitution, provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under that clause, Congress has the power "to preempt state legislation if it so intends." *Hi Tech Transp., LLC v. N.J. Dep't of Envtl. Prot.*, 382 F.3d 295, 302 (3d Cir.2004) (internal quotation omitted); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) ("[U]nder the Suprema-

cy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."); *Gibbons v. Ogden*, 9 Wheat. 1, 22 U.S. 1, 82, 6 L.Ed. 23 (1824) (stating that "acts of the State Legislatures . . . [that] interfere with, or are contrary to, the laws of Congress" must be invalidated, and that "the law of the State, though enacted in the exercise of powers not controverted, must yield to [the federal law]"). While the Supremacy Clause plainly provides Congress with the constitutional power to preempt state law, the challenge for courts has been deciding when a conflict between state and federal law requires application of that power. *See Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (acknowledging that there is not "an infallible constitutional test or an exclusive constitutional yardstick" for the application of preemption).

■ The Supreme Court has identified three types of preemption: express preemption, field preemption, and implied conflict preemption. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 238–39 (3d Cir.2009). The first, express preemption, exists when Congress includes in a statute explicit language stating an intent to preempt conflicting state law. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) ("State action may be foreclosed by express language in a constitutional enactment."). The second, field preemption, occurs when a state law impinges upon a "field reserved for federal regulation." *United States v. Locke*, 529 U.S. 89, 111, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). This form of preemption exists "either . . . [where] the nature of the regulated subject

matter permits no other conclusion, or [where] the Congress has unmistakingly so ordained." *Fl. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Lastly, and most significantly for the present case, implied conflict preemption exists when, "under the circumstances of [a] particular case, [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[9] *Hines,* 312 U.S. at 67, 61 S.Ct. 399.

■ In analyzing a potential conflict between federal and state law, we must be "guided ... 'by the rule that the purpose of Congress is the ultimate touchstone in every preemption case.'" *Id.* at 575 F.3d at 334 (citing *Altria Group, Inc. v. Good,* — U.S. ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008)). We are required to consider "the entire scheme of the [federal] statute" and identify "its purpose and intended effect." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Only then can we determine whether the opposing state law presents a "sufficient obstacle" such that it requires preemption. *Id.* at 374 n. 8, 120 S.Ct. 2288. While there is a recognized presumption against preemption, *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and we seek to avoid it when possible, *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 432, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005), conflicts that are implied by operation of state law are "of no less force than that which is expressed." *Crosby,* 530 U.S. at 373, 120 S.Ct. 2288 ("If the purpose of the act cannot otherwise be accomplished ... the state law must yield to the regulation of Congress within the

sphere of its delegated power.") (citations omitted). Thus, in deciding whether the Reform Act preempts the sovereign immunity that SEPTA claims, we must scrutinize the effect of the state law interpretation pressed by SEPTA and "ascertain Congress's intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

■ The specific statutory provision at issue here is § 28103(b) of the Reform Act, which reads as follows:

(b) Contractual obligations—A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims.

49 U.S.C. § 28103(b). The language is neither complex nor ambiguous. A plain reading of that single sentence reveals that the Act grants Amtrak power to enter into binding contracts that allocate financial responsibility for claims against it. Such a reading is confirmed by looking to other language in the statute, particularly the description of congressional findings, which include that "(1) intercity rail passenger service is an essential component of a national intermodal passenger transportation system; (2) Amtrak is facing a financial crisis, with growing and substantial debt obligations severely limiting its ability to cover operating costs and jeopardizing its long-term viability; and (3) immediate action is required to improve Amtrak's financial condition if Amtrak is to survive." 49 U.S.C. § 24101; *see also* Amtrak Reform Act, Pub.L. 105–134, 105th Congress, 1st Session, 111 Stat. 2570, 2571, § 2.

The broad wording of § 28103(b), combined with those findings, shows that subsection (b) was enacted to facilitate Am-

---

**9.** We sometimes call this "implied obstacle preemption." *Holk v. Snapple Beverage Corp.,* 575 F.3d 329, 334 (3d Cir.2009).

trak's entering into contracts to transfer liability risk to entities like SEPTA. Pennsylvania's sovereign immunity statute, if applied as SEPTA urges, would be a complete obstacle to Amtrak's ability to enter into such contracts because it would directly prevent Amtrak from being able to allocate financial responsibility to SEPTA. Permitting the invocation of sovereign immunity would thus have the impermissible impact of preventing Amtrak from doing exactly what the Reform Act says Amtrak can do, thereby moving Amtrak towards the financial instability that the Reform Act sought to avoid. Therefore, based on the plain language of the statute, we conclude that the Reform Act preempts the application of Pennsylvania's sovereign immunity statute.[10]

If the plain language of the statute were not clear enough to demonstrate congressional intent, the legislative history of the Reform Act is. *See United States v. Gregg*, 226 F.3d 253, 257 (3d Cir.2000) ("To determine a law's plain meaning, we begin with the language of the statute. If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there. . . . Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history. . . ."). That history only serves to strengthen the conclusion of implied conflict preemption.

A Senate Report explains that the Reform Act was designed to "enable Amtrak to increase efficiencies, reduce costs, and [to] permit changes to its liability." S.Rep. No. 105–85 at 1, Committee on Commerce, Science, and Transportation, 105th Congress, 1st Session (Sept. 24, 1997) ("Senate Report"). The Report highlights the importance of the railroads in this region of the country and cautions that, if the Reform Act failed to become law, bankruptcy could occur, because "Amtrak is staking the future of the national system on the projected financial success of highspeed rail service in the Northeast Corridor." *Id.* at 2–3; *see also id.* at 12 (explaining the "urgent need for immediate action to improve Amtrak's financial condition and eliminate its dependency. . . ."). With regard to § 28103(b) in particular, the Senate Report explains that the purpose behind that subsection is to "clarif[y] that indemnification agreements related to the provision of rail passenger service entered into by Amtrak and other parties would be enforceable." *Id.* at 5; *see also id.* at 14 ("Subsection (b) . . . clarifies that rail passenger indemnification agreements entered into by Amtrak and other parties are enforceable."). In fact, the Report outlines a scenario closely analogous to what is at issue here:

As long as there is the possibility that state laws governing indemnification

---

10. This approaches express preemption but does not qualify as such because the language of § 28103(b), while clear in its implication, is not explicit about preemption. "Express preemption occurs when Congress 'explicitly state[s]' that it intends a statute to have that effect." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Such preemption is thus generally found only when Congress has used language that expressly precludes state regulation in a given area. *See St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the United States Virgin Islands*, 218 F.3d 232, 238 (3d Cir.2000) (holding that express preemption only "arises when there is an explicit statutory command that state law be displaced"); *see also Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 364, 122 S.Ct. 2151, 153 L.Ed.2d 375 (describing the "express preemption" language in ERISA); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62–63, 123 S.Ct. 518, 154 L.Ed.2d 466 ("Because the [Federal Boat Safety Act] contains an express pre-emption clause, our task of statutory construction must in the first instance focus on the plain wording of the clause. . . .").

contracts may make those contracts unenforceable, Amtrak and a freight railroad may find themselves litigating with each other. Amtrak believes that such litigation inevitably would not only adversely impact business relationships between Amtrak and the host freight railroads, but it would also lead to significantly higher outlays in settlements and judgments to plaintiffs.

*Id.* at 5.

A report from the House of Representatives similarly emphasizes that "indemnity contracts ... are fully enforceable without regard to any other law or public policy." H.R.Rep. No. 105–251 at 15, Committee on Transportation and Infrastructure, 105th Congress, 1st Session (Sept. 17, 1997) ("House Report"). The House Report is explicit that "a crucial feature of the liability reform provision is the affirmation of the right of owners of ... passenger operators to indemnify by contract." *Id.* at 17.

In short, legislative history reveals that giving Amtrak the freedom to negotiate agreements with other carriers to allocate the financial consequences of liability was a key component of the Reform Act, and § 28103(b) was specifically needed to eliminate "the possibility that state laws can nullify [Amtrak's] indemnification contracts." *Senate Report,* at 14. The Pennsylvania sovereign immunity statute, to the extent it could nullify the NEC Agreement, stands as a direct obstacle to that goal, and, as such, is preempted.

SEPTA offers several arguments for not giving preemptive effect to the Reform Act. Each is unpersuasive. First, SEPTA notes that § 28103(b) states that Amtrak "may" enter into indemnity contracts. SEPTA then says that the statutory language is "merely permissive" and so is insufficient to "justify such a broad preemption of state law." (Appellant's Op. Br. at 13.) However, it cites no precedent to support its contention that a statute has less preemptive force because it authorizes rather than compels certain acts. Moreover, it does not explain how the Reform Act can be reasonably read to give Amtrak the option to enter into indemnity contracts while simultaneously giving entities like SEPTA the prerogative to ignore those same contracts.

Second, relying on the principle that preemption analysis should attempt to "reconcile the operation of both statutory schemes with one another," *Hi Tech Trans,* 382 F.3d at 302, SEPTA suggests that its state-law sovereign immunity and the Reform Act can be reconciled because there are enumerated exceptions to the immunity. While there are, as SEPTA says, nine enumerated exceptions to its sovereign immunity, they are narrow[11] and have no impact on SEPTA's indemnity

---

**11.** As summarized by the District Court, 42 Pa. Cons.Stat. Ann. § 8522(b) states that

> [T]he defense of sovereign immunity shall not be raised to claims caused by: (1) the operation of any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel; (3) the care, custody or control of personal property in the possession or control of Commonwealth parties; (4) a dangerous condition of Common-

> wealth agency real estate and sidewalks; (5) a dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements; (6) the care, custody or control of animals in the possession or control of a Commonwealth party; (7) the sale of liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; or (9) the administration, manufacture and use of a toxoid or vaccine.
> (App. at A8 (citing 42 Pa. Cons.Stat. Ann. § 8522(b)).)

obligation to Amtrak. Indeed, it is surely only because they have no impact here that SEPTA cites them, for, if they did accommodate the purpose of the Reform Act, they would run counter to SEPTA's effort to escape liability. Contrary to what SEPTA suggests, it is not possible to reconcile the claim of state-law sovereign immunity with the express purpose of the Reform Act.

Third, SEPTA argues that Congress could not have intended § 28103(b) to have preemptive effect because Congress chose to include an explicit statement of preemption in another subsection of the statute, § 28103(a).[12] Congress knew how to broadly preempt state law if it so intended, SEPTA argues, and Congress did not intend to do so by subsection (b). We acknowledge that § 28103(b) does not contain an express preemption clause.[13] However, even though subsection (b) is not expressly preemptive, it is still quite clear. The preemptive consequences of its language are sufficiently plain for us to say that Congress intended to obviate all obstacles to the enforceability of contracts to indemnify Amtrak. Further, the expression of preemption in one subsection does not mean that preemption was not intended by the language of another subsection on another topic. *See Bruesewitz,* 561 F.3d at 239 ("[I]mplied preemption may exist even in the face of an express preemption clause."); *see also Freightliner Corp. v. Myrick,* 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (noting that an express preemption clause in a statute does not "foreclose [the] possibility of implied preemption"). Again, "the purpose of Congress is the ultimate touchstone in every preemption case," *Holk* 575 F.3d at 334, and, as discussed above, the

purpose here is not in doubt: § 28103(b) was passed to "clarif[y] that rail passenger service indemnification agreements entered into by Amtrak and other parties are enforceable." *Senate Report* at 14.

Fourth, SEPTA contends that its sovereign immunity defense should not be preempted because "Congress was certainly aware of SEPTA's status with respect to liability yet it chose not to expressly preempt that status." (Appellant's Op. Br. at 16.) This argument, put forward with no support, rests on the peculiar proposition that Congress knew that SEPTA would enter into indemnity contracts with no intent or capacity to honor them. It is true that Congress was aware that state laws existed "to protect the taxpayers who ultimately bear the costs of tort liability incurred in providing the public transportation." *House Report,* at 21. In fact, recognizing the threat those laws posed to the viability of indemnity agreements, the House warned that "[w]ithout the confirmation that indemnity agreements will be upheld in court, [Amtrak] will be placed in jeopardy as [it] resists taking on what is increasingly viewed as an unacceptable and uncompensated liability exposure." *Id.* But that does not mean that Congress was "certainly aware" of the sovereign immunity position that SEPTA would take when reneging on its indemnity obligations. Even if Congress had been aware of SEPTA's bait-and-switch position, however, the intent of the Reform Act remains clear in its commitment to the enforcement of those obligations.

Finally, SEPTA argues that Congress, in enacting § 28103(b), only intended to preempt state laws expressly governing the enforceability of indemnity contracts, and, more specifically, state laws that pro-

---

12. Subsection (a) preempts state law with respect to punitive damages and aggregate liability. 49 U.S.C. § 28103(a).

13. *See supra,* n. 10.

hibit indemnification when there is a finding of gross negligence. Accordingly, SEPTA reasons, the Reform Act should preempt only that specific kind of state law, and not a law of general applicability like Pennsylvania's sovereign immunity statute. A finding of preemption in the present case, says SEPTA, would be far too "vast," and would "wipe away all principles of state contract law that may be utilized as a defense to contractual liability and/or contract formation." (Appellant's Op. Br. at 13.)

The Reform Act was indeed intended to preempt state laws of the sort described by SEPTA. In fact, subsection (b) was passed in part to supersede *National R.R. Passenger Corp. v. Consolidated Rail Corp.*, 698 F.Supp. 951 (D.D.C.1988) (overruled on other grounds), which held that an indemnification agreement between Amtrak and ConRail violated District of Columbia public policy because it allowed indemnification in the context of gross negligence. *See House Report*, at 33–44; *see also O & G Indus.*, 537 F.3d at 166–67 ("[I]t was precisely the doubts cast by the [*Consolidated Rail*] decision over the validity of indemnity agreements by railroad parties that prompted Congress to enact § 28103(b)."). It does not follow, however, that that was the limit of congressional intent. To the contrary, it would be odd to suppose that Congress meant to eliminate a specific obstacle to its purpose of protecting Amtrak's ability to spread risk but had no concern with a broader obstacle having the same effect. The Reform Act's legislative history demonstrates that Congress intended to override any and all

state laws that might interfere with the enforceability of Amtrak's contracts, not only those state laws specifically enacted to govern indemnity agreements. *See House Report*, at 13 ("[I]ndemnity contracts ... are fully enforceable without regard to *any other* law or public policy.") (emphasis added); *cf. O & G Indus.*, 537 F.3d at 160–63 (rejecting the argument that § 28103(b) only applies to indemnity contracts with freight railroads, and holding that the Reform Act was meant "to ensure the enforceability of indemnity agreements Amtrak concludes with *any* other party.")

The Second Circuit's opinion in *O & G Industries* supports that conclusion. In *O & G Industries*, the Second Circuit held that § 28103(b) preempted a Connecticut statute which, on public policy grounds, voided any indemnity provision contained in construction-related contracts, if the provision purported to indemnify a party against its own negligence. 537 F.3d at 158; *see also* Conn. Gen.Stat. § 52–572k(a).[14] The Court rejected O & G Industries' argument that there was a limitation on the kinds of conflicting state laws preempted by the Reform Act, stating that

[t]he goal of the Reform Act was to shield *all* of Amtrak's indemnity arrangements from legal attacks on their validity. [In enacting § 28103(b)], Congress ... encouraged all providers of rail passenger transportation to enter into contracts that allocate financial responsibility for claims.... Congress also affirmed the enforceability of contracts that include indemnification obligations.

14. The Second Circuit finds preemption in three scenarios: "(1) where Congress expressly states its intent to preempt; (2) where Congress's scheme of federal regulation is sufficiently comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law

actually conflicts with federal law." *O & G Industries*, 537 F.3d at 161. In *O & G Industries*, the Second Circuit found preemption under its third category, conflict preemption, *id.*, which is analogous to our finding of implied conflict preemption.

*O & G Indus.*, 537 F.3d at 162 (citation omitted) (original emphasis).

Thus, as our sister circuit decided, Congress intended with the passage of the Reform Act, and, more specifically, with the passage of § 28103(b), that all of Amtrak's indemnity agreements should be enforceable, regardless of the kind of conflicting state law that might be erected. SEPTA's state-law sovereign immunity assertion directly conflicts with the enforcement of its indemnity contract with Amtrak and thus presents an irreconcilable obstacle to the objectives of § 28103(b). Accordingly, that invocation of sovereign immunity is preempted under principles of implied conflict preemption.[15]

### B. Preemption and Retroactivity

■ SEPTA also argues that, even if some claims of sovereign immunity are preempted by § 28103(b), there can be no preemption here without giving the Reform Act an impermissible retroactive effect. The NEC Agreement was executed a decade prior to the passage of the Reform Act. By SEPTA's reasoning, applying the Reform Act to an indemnity agreement entered into prior to the enactment of that statute is untenable because Congress did not expressly provide for retroactive application.

■ Before asking whether Congress intended the Reform Act to have any retroactive effect, we must first ask whether the statute even has such an effect. A statute "has retroactive effect when it 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already

past.'" *Id.* at 227 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Analyzing whether a statute operates retroactively "is not always a simple or mechanical task." *Id.* at 268. The analysis requires a "commonsense, functional judgment as to whether a statute attaches new legal consequences." *Atkinson v. Att'y Gen.*, 479 F.3d 222, 231 (3d Cir.2007). In seeking that commonsense answer, we can "be guided by considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (emphasis omitted). Moreover, "[a] statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483 (citation omitted). "Rather, the statute's temporal reach becomes unacceptable only when its retroactive application would significantly impair existing rights and thereby disappoint legitimate expectations." *Dinnall v. Gonzales*, 421 F.3d 247, 252 (3d Cir.2005) (citation omitted).

■ In deciding whether a statute has a retroactive effect, a court must determine the "important event" to which the statute allegedly attaches new legal consequences. *See Atkinson*, 479 F.3d at 230 (stating that the defendant's conviction was the "important event" to which the federal statute attached a new legal consequence). In the present case, the important event is not the execution of the NEC Agreement in 1982, as SEPTA asserts, but is rather the Deweese accident in 2004, after which Amtrak had the right to indemnity from SEPTA for that accident. SEPTA did not owe Amtrak any indemnity obligation for the Deweese accident un-

---

15. Lest there be any misunderstanding, we emphasize that this does not constitute a general preemption or invalidation of Pennsylvania's sovereign immunity statute. We hold only that SEPTA's effort to invoke that statute to escape the consequences of its indemnity obligations to Amtrak cannot be permitted, for the reasons stated.

til it occurred on October 28, 2004, and, thus, SEPTA's alleged sovereign immunity defense did not arise until Amtrak filed its cross-claim for indemnity. Therefore, the Reform Act, passed in 1997, did not attach any new "legal duties" to events at issue here, which took place long after it was enacted. Because Amtrak's right to indemnity for the 2004 accident did not accrue until 2004, and the Reform Act was passed seven years before, SEPTA's argument that there is impermissible retroactivity lacks merit.

Moreover, SEPTA had "fair notice" of the Reform Act's effects well before Amtrak first invoked its contractual indemnity right in 2004 and so has no basis for claiming "reasonable reliance" on its sovereign immunity defense. *See Atkinson,* 479 F.3d at 231 (stating that in retroactivity analysis, "a court can certainly be guided by considerations of fair notice, reasonable reliance, and settled expectations") (emphasis omitted). Between 1997, when the Reform Act was passed specifying that all of Amtrak's indemnity contracts would be upheld, and 2004, when the accident occurred, SEPTA had ample time to seek termination of the NEC Agreement or to renegotiate its indemnity obligations, if it wished to limit them.

### III. *Conclusion*

Section 28103(b) of the Reform Act reflects Congress's unequivocal support for indemnity agreements such as the ones between Amtrak and SEPTA. The plain meaning of the statute is confirmed by legislative history, which specifically notes Congress's intent to eliminate "the possibility that state laws can nullify [Amtrak's] indemnification contracts." *Senate Report* at 14. Because SEPTA cannot be allowed to use Pennsylvania's sovereign immunity statute to frustrate the goals of the Reform Act, we will affirm the judgment of the District Court.