**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAMELA L. McKISSICK, an
individual,

      Plaintiff/Counter-Defendant-
      Appellant,

v.

HENRY C. YUEN, an individual;
ELSIE M. LEUNG, an individual,

      Defendants-Appellees,

and

GEMSTAR-TV GUIDE
INTERNATIONAL, INC.,

      Defendant/Counter-Claimant-
      Appellee.

Nos. 08-5151 & 09-5078

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:04-CV–00262-JHP-SAJ)**

---

Donald R. Bradford of Seeger Weiss LLP, Tulsa, Oklahoma, for
Plaintiff/Counter-Defendant-Appellant.

Brian E. Maas of Frankfurt Kurnit Klein & Selz P.C., New York, New York
(Jessie F. Beeber, Patrick J. Boyle, and Amelia K. Seewann of Frankfurt Kurnit
Klein & Selz P.C., New York, New York; and Joseph R. Farris and Paula J.
Quillin of Feldman, Franden, Woodard & Farris, Tulsa, Oklahoma, with him on
the briefs), for Defendants-Appellees Henry C. Yuen and Elsie M. Leung.

John E. Dowdell (Jo Lynn Jeter and Steven M. Ruby, with him on the briefs), Norman Wohlgemuth Chandler & Dowdell, Tulsa, Oklahoma, for Defendant/Counter-Claimant-Appellee Gemstar-TV Guide International, Inc.

---

Before **HARTZ, HOLLOWAY,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Pamela McKissick, a former Gemstar executive, sued the company and two of its former officers, accusing them of perpetrating a fraud that rendered her stock options in the company worthless. The district court granted summary judgment to the defendants, holding that Ms. McKissick released her claims long ago when she signed a separation agreement at the end of her employment. Based on another provision in that same agreement, the district court also awarded attorney fees to both Gemstar and its former officers. Ms. McKissick now appeals all these determinations.

We agree with the district court that the separation agreement unambiguously bars Ms. McKissick's claims and affirm summary judgment for the defendants on that score. Although we also agree with the district court that the separation agreement entitles Gemstar to recoup the attorney fees it incurred in defending Ms. McKissick's suit, the agreement doesn't permit the company to recover the fees it incurred in prosecuting a counterclaim against Ms. McKissick. We thus vacate the district court's fee award to Gemstar, and remand the matter

for recalculation of an appropriate award. As for the former officers, we conclude the separation agreement doesn't entitle them to attorney fees at all. Accordingly, we reverse their fee award.

I

A

This case began on the eve of a merger between Gemstar and TV Guide in July 2000. In the deal, Gemstar, a technology company, was slated to take control of TV Guide, the longtime publisher of television programming guides. At the time, Ms. McKissick served as President and Chief Operating Officer of a TV Guide subsidiary. Ms. McKissick apparently worried about the merger and what it might mean for her options to purchase 200,000 shares of TV Guide common stock. If she exercised those options before the merger, and many were slated to vest by that point, Ms. McKissick was confident that their value would allow her to fulfill her longtime dream of owning a horse ranch in Oklahoma. In the end, however, she didn't exercise the options, and this lawsuit is all about why.

According to Ms. McKissick, Henry Yuen and Elsie Leung, executives for Gemstar, lobbied her to stick with the new company and hold on to her options. They told her it would be bad for the merger if senior TV Guide executives were seen selling, a signal to investors that they lacked faith in TV Guide's new parent company. Better, they said, to wait, convert the TV Guide options into Gemstar

options, and exercise them later. The merger, they said, would be nothing but good for Ms. McKissick and her stock options. The options' value was sure to rise. If only she would wait three years, she could "retire on the beach."

Ms. McKissick waited. The merger occurred in July 2000 and Ms. McKissick retained both her position within the newly merged company and most of her stock options. Even so, she went ahead with her ranch plans, purchasing a number of Icelandic horses and eighty acres near Tulsa. Ms. McKissick depended on her salary to stay current with the financing for the ranch, and she shared this fact with Gemstar higher-ups. They, in turn, assured her that her job was safe.

Things turned out differently. Gemstar's share price fell significantly by early 2003, to the point where Ms. McKissick believed her stock options virtually worthless. According to Ms. McKissick, the responsible parties for all this were Mr. Yuen and Ms. Leung, who fraudulently reported Gemstar's finances in connection with and following the merger. Once discovered, Ms. McKissick alleges, this misconduct caused the company's value to tumble, and eventually contributed to the company's decision to terminate Mr. Yuen's and Ms. Leung's employment in April 2003.

As it happened, Ms. McKissick, too, was soon to leave Gemstar. An at-will employee, she learned of Gemstar's plans to fire her in July 2003, and soon afterward met with a human resources representative to discuss a severance agreement. Ms. McKissick sought eighteen months' salary and health coverage, a

temporary consulting position, and a guarantee she would be reimbursed for any expenses she might incur should her cooperation be needed in litigation against the company. The Separation Agreement and Release ("Agreement") Gemstar ultimately offered, and which Ms. McKissick ultimately accepted, included some but not all of these requests. The Agreement afforded Ms. McKissick $345,000 severance (equivalent to a year's salary), an $80,000 "bonus" for her "cooperation in the transition of her duties," reimbursement for expenses incurred in cooperating with the company in litigation, and eighteen months' health insurance, but the Agreement did not include the consulting arrangement she sought.

The Agreement also included two provisions concerning claims Ms. McKissick might seek to bring against Gemstar or other parties. Though lengthy, these provisions are the focus of the dispute before us and so we offer them here, in full. The first, the "Release," said:

> 6. <u>Released Actions/General Release</u>. Employee (on behalf of herself and all her heirs, assigns, legal representatives, successors in interest, or any person claiming through her) hereby irrevocably and unconditionally releases and forever discharges the Company, its divisions, units, subsidiaries, parents, and all other affiliated entities, and each of their current and former employees, officers, directors, representatives, agents, shareholders, attorneys, accountants, partners, insurers, advisors, partnerships, assigns, successors, heirs, predecessors in interest, joint ventures, and affiliated persons (collectively "Released Parties") from any and all liabilities, causes of action, charges, complaints, suits, claims, obligations, costs, losses, damages, injuries, rights, judgments, attorney's fees, expenses, bonds, bills, penalties,

fines, liens, and all other legal responsibilities of any form or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which she has or had or may claim to have by reason of any and all matters from the beginning of time through the Effective Date (hereinafter collectively "Released Actions") including, but not limited to, those arising from or in connection with Employee's employment with the Company or the termination of such employment relationship or under any federal, state or local employment laws, regulations, orders or other requirements, including, without limitation, any and all claims related to race, color, ancestry, national origin, sex, disability, medical condition, religion, age, sexual orientation or marital status discrimination in employment under Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act, the Fair Employment and Housing Act, the Workers Adjustment and Retraining Notification Act, the Equal Pay Act, the Americans with Disabilities Act, the Fair Labor Standards Act, any Oklahoma state law, statute, rule, regulation or ordinance pertaining to labor, employment, discrimination or benefits, or any other law, regulation, or ordinance that may have arisen from Employee's employment with the Company and/or as a result of, or in connection with, the termination of her employment relationship with the Company.

**In short, Employee (on behalf of herself and the others described above) hereby knowingly and voluntarily releases any and all claims she has or may have against the Company and/or the other Released Parties.**

Separation Agreement and Release ¶ 6, Aplt. App. Vol. I at 144 (emphasis in original).[1]

The second relevant provision, the "No Actions Clause," added this:

17. <u>No Actions</u>. Employee represents and warrants that she has not filed any complaints or charges or lawsuits against the Company with any governmental agency or any court, and has not assigned any cause of action to any third party, and that she will not file lawsuits against

---

[1] All citations to the Appellant's Appendix and briefs refer to documents filed in Appeal No. 08-5151.

- 6 -

the Company for claims arising up to and including the Effective Date at any time hereafter; provided, however, that nothing in this Agreement shall be deemed to limit Employee from filing an action for the sole purpose of enforcing her rights under this Agreement. If Employee violates the Agreement by bringing or maintaining any charges, claims, grievances, or lawsuits contrary to this provision, she will pay all costs and expenses of the Company and/or related persons in defending against such charges, claims or actions brought by her or on her behalf, including reasonable attorney's fees, and will be required to refund, at the Company's sole discretion, the value of any amount paid by the Company in exchange for this Agreement.

Separation Agreement and Release ¶ 17, Aplt. App. Vol. I at 146.

After the Agreement was signed, Ms. McKissick left the company in August 2003.

B

This, however, was only the beginning of things. In March 2004, Ms. McKissick brought this lawsuit seeking damages from Gemstar, Mr. Yuen, and Ms. Leung. She asserted, among other things, that Mr. Yuen and Ms. Leung (the "Individual Defendants") made false and misleading statements overstating the company's revenues, which then led to an artificial inflation in Gemstar's share price. All that, together with the Individual Defendants' entreaties not to sell company stock, induced Ms. McKissick to hold on to her stock options (and convert them from TV Guide to Gemstar), rather than exercise them as she'd planned. Once Gemstar's true financial landscape was discovered, its share price plummeted, destroying the value of Ms. McKissick's options. And this, Ms.

McKissick alleged, constituted fraud, negligent misrepresentation, and a violation of the federal Securities Exchange Act.

Gemstar responded to Ms. McKissick's complaint with a motion for summary judgment and a counterclaim of its own. In seeking summary judgment on Ms. McKissick's claims, Gemstar asserted that the Release served to bar "any and all" claims she might have against the company. The company's counterclaim, meanwhile, relied on the No Actions Clause. In that clause, Ms. McKissick covenanted not to sue the company — a covenant, Gemstar maintained, she breached by bringing her suit. As damages for Ms. McKissick's alleged breach, Gemstar sought not just the costs it incurred in defending against Ms. McKissick's claims, including attorney fees, but also the return of all money Ms. McKissick received under the Agreement.

For her part, Ms. McKissick opposed Gemstar's motion for summary judgment, asserting that in the Agreement she released only claims arising out of her employment with the company — and that the claims in her lawsuit focused solely on her stock options, not her employment. Ms. McKissick also alluded to various other possible defenses — including duress — that, she suggested, could render the Agreement unenforceable, but she never explained how this might be so.

In the end, the district court held the Agreement unambiguously barred Ms. McKissick's claims. The court also granted Gemstar summary judgment on its

counterclaim, awarding the company its attorney fees in defending against Ms. McKissick's claims, as well as the attorney fees it incurred litigating its counterclaim. The district court denied, however, Gemstar's request for return of Ms. McKissick's payment under the Agreement, believing that would be excessively punitive.

Having achieved these victories, Gemstar moved the district court to certify the summary judgment decisions in its favor as a final judgment pursuant to Fed. R. Civ. P. 54(b). The court denied that request, however, noting that Ms. McKissick's claims against the Individual Defendants remained unresolved. Because those claims and the Gemstar claims involved common issues, the district court concluded, an appeal should wait until the entire action reached final judgment.

There was a reason why the claims against the Individual Defendants remained unresolved. Apparently, getting a hold of Mr. Yuen and Ms. Leung wasn't easy: they weren't served with the complaint until more than four months after Gemstar, and then only by publication. As a result, Ms. McKissick's case against the Individual Defendants proceeded on a distinct procedural track from her case against the company. At the end of the day, though, the result was much the same. After discovery, the district court concluded that the Agreement barred Ms. McKissick's claims against the Individual Defendants, and at last entered a final judgment on all the claims before it. Ms. McKissick promptly appealed.

After Ms. McKissick filed her appeal, the Individual Defendants moved the district court for attorney fees. Like Gemstar, they argued that the No Actions Clause guaranteed them as much. Ms. McKissick opposed the motion, claiming the district court lacked jurisdiction to entertain the Individual Defendants' fee request because she had already appealed its final judgment. In any event, she argued, the Individual Defendants were not entitled to a fee award under the terms of the No Actions Clause. The district court rejected these arguments, concluded it retained jurisdiction to deal with what it considered to be a collateral fee issue, and awarded the Individual Defendants attorney fees as "related persons" under the No Actions Clause. Ms. McKissick then appealed this determination, too.

In approaching Ms. McKissick's challenges to the district court's various rulings, we address first the district court's disposition of her claims against Gemstar (Section II) and Gemstar's counterclaim against her (Section III), before turning to consider the district court's resolution of Ms. McKissick's claims against the Individual Defendants (Section IV) and their motion for attorney fees (Section V).

II

We begin by asking whether the Agreement between Gemstar and Ms. McKissick bars the claims Ms. McKissick seeks to bring against the company. In concluding it does, we address three essential considerations: (A) the plain meaning of the Release; (B) Ms. McKissick's competing interpretation; and (C)

alleged factual disputes that might preclude summary judgment. Perhaps needless to say, we assess the propriety of the district court's grant of summary judgment to the company *de novo*, while viewing the facts in the light most favorable to Ms. McKissick, as the non-movant; because this case reaches us through the district court's diversity jurisdiction and the parties' contract specifies that Oklahoma law governs their agreement, we analyze the substantive legal questions associated with their dispute under, and in light of, that state's law.

A

When asked to interpret a contract, our task may be stated simply: to determine and "give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." 15 Okla. Stat. § 152. That charge, however, doesn't give us a commission to plumb the minds of the parties for whatever hidden, subjective intentions we might find there. Where, as here, we have a written contract, the parties' "intention . . . is to be ascertained from the writing alone, if possible." 15 Okla. Stat. § 155. In ascertaining the parties' meaning, we must consider "[t]he whole of [the] contract," and seek "to give effect to every part." 15 Okla. Stat. § 157. If, taken as a whole, "the language of a contract is clear and without ambiguity, the Court is to interpret it as a matter of law." *Corbett v. Combined Commc'ns Corp. of Okla.*, 654 P.2d 616, 617 (Okla. 1982); 15 Okla Stat. § 154. Whether an ambiguity exists in a contract, and so sanctions resort to and consideration of

extrinsic evidence, is also a question of law for the court to decide. *See Corbett*, 654 P.2d at 617.

Applying these principles, we are confident the district court properly granted Gemstar summary judgment on Ms. McKissick's claims. As the parties agree, Gemstar's entitlement to summary judgment depends, at least in the first instance, on whether her claims qualify as "Released Actions" under the Release provision of the Agreement. The answer to that critical question is, unambiguously, "yes." In the Release, Ms. McKissick absolved Gemstar from "*any and all*" claims "of *any form or nature* whatsoever," that she might have had against the company "by reason of *any and all matters* from the beginning of time through the Effective Date." Separation Agreement and Release ¶ 6, Aplt. App. Vol. I at 144 (emphasis added). Capping this off is a succinct, one-sentence summary of what the Release effects, which the parties took care to ensure even a careless reader would find difficult to miss, bolding and underlining its terms: "**In short, Employee (on behalf of herself and the others described above) hereby knowingly and voluntarily releases any and all claims she has or may have against the Company and/or the other Released Parties.**" *Id.*

It is hard to conceive of terms that might evince a more sweeping — or emphatic — release. The only limitation the Release abides is, as Gemstar notes, a temporal one: to be barred, the asserted claims must have existed by reason of "matters" that occurred on or before the Agreement's Effective Date. Yet, Ms.

- 12 -

McKissick doesn't dispute that all of her claims arise from matters within the covered time period. Accordingly, we cannot help but conclude that, as a matter of the parties' plain contractual language, Ms. McKissick released her claims against Gemstar when she signed the Agreement, and so she cannot now pursue them in court.

B

Ms. McKissick, of course, presents a very different reading of the Agreement and she offers four reasons for it. None of this, however, persuades us that the Release means anything other than what it says.

1

Ms. McKissick begins by drawing our attention to the final clause of the Release (apart from the separate, bolded and underlined summary sentence) — namely, the phrase "that may have arisen from Employee's employment with the Company and/or as a result of, or in connection with, the termination of her employment relationship with the Company." These words, she says, serve to limit the scope of the entire preceding Release so that it encompasses *only* claims arising from her employment (or termination). And, she says, her stock-option claims don't arise from her employment with Gemstar.

Even assuming that Ms. McKissick's stock option claims don't arise out of her employment with Gemstar — an assumption Gemstar hotly disputes — this hardly means her claims weren't released. That is because the phrase in the

Release discussing claims arising from Ms. McKissick's employment and termination appears within an "including but not limited to" clause. In this way, the phrase's role is to serve as an example, an illustration, a representation of what's encompassed within the Release — not to crab or limit its plain language indicating the parties' intent to discharge "any and all" claims Ms. McKissick might have against Gemstar "from the beginning of time through the Effective Date" of the Agreement. The phrase Ms. McKissick points to was obviously meant to put illustrative meat on the Release's bones, not to grind those bones to dust. *See, e.g.*, *Eck v. Godbout*, 831 N.E.2d 296, 301 (Mass. 2005) (claims listed within "including but not limited to" clause are "not intended to limit the generality of any prior, broad description of the full extent of claims being released"); Black's Law Dictionary 777-78 (8th ed. 2004) ("including but not limited to" "typically indicates a *partial* list" (emphasis added)). Yet, Ms. McKissick would have us lift the language referring to employment-related claims from its humble station as one illustration of the sort of claims she released to a new and exalted prominence as the central governing principle of the whole Release. Her interpretation would go so far as effectively to read out of the contract and render a nullity the parties' agreement that Ms. McKissick would discharge "any and all" claims against Gemstar arising "by reason of any and all matters" — and do so in irreconcilable tension with our usual duty "to give effect to every part [of the contract], if reasonably practicable." 15 Okla. Stat. § 157.

In this way, her interpretation risks making nonsense of the Release; as she would have it, the provision would read something like this: "Employee releases the Company from any and all claims *that may have arisen from Employee's employment with the Company*, including but not limited to*, those arising from or in connection with Employee's employment with the Company . . . .*" Surely we should be wary of concluding such sophisticated parties crafted such an extensive release to so little effect.[2]

2

Ms. McKissick next points to a prefatory clause in the Agreement that, she says, confirms her view that she released only claims arising out of her employment. That clause reads: "WHEREAS, Employee and the Company desire to resolve any claims or potential claims the Employee may have against the

---

[2] Ms. McKissick also suggests that the Release's final clause might instead modify the phrase "any and all claims related to race, color, ancestry, [or other] discrimination." On this reading, the Release would read (again, greatly simplified), "Employee releases the Company from any and all claims including, but not limited to, those arising from Employee's employment or under any employment laws, including, without limitation, any and all claims *that may have arisen from Employee's employment with the Company* related to race, color, ancestry, or other discrimination under Title VII and other laws and regulations." This may well be the appropriate place to hang the italicized modifier. But even if we assume Ms. McKissick is correct on this score, it does her no good. The final clause remains no less nestled within the "including but not limited to" clause, and does nothing to limit the Release's discharge of "any and all claims," known or unknown to the parties. Indeed, on this interpretation, the italicized clause does even less to help Ms. McKissick's cause, doing nothing more than serving to modify *another* illustrative example within the "including but not limited to" clause rather than acting as such an example itself.

Company arising from her employment relationship or the termination thereof." Separation Agreement and Release, Aplt. App. Vol. I at 143. This language, Ms. McKissick says, evinces an intention to release only employment-related claims, not all possible claims.

It does not. "As a general rule, recitals in a contract will not control the operative clauses thereof unless the latter are ambiguous; but they may be looked to in determining the proper construction of the contract and the parties' intention." *Ferrell Constr. Co. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1009 (Okla. 1982) (internal quotation marks omitted). And, as we've discussed, there's no ambiguity in the operative clause in this Release that might allow resort to a recital. No doubt resolution of potential claims arising from Ms. McKissick's employment and termination supplied an important, perhaps even primary, reason motivating the parties' agreement. But the Release itself makes pellucidly clear that its effect is "*not limited to*" those kinds of claims. Separation Agreement and Release ¶ 6, Aplt. App. Vol. I at 144 (emphasis added). The "Whereas" clause can do nothing to change that fact.

3

Ms. McKissick further argues that the Agreement allocated the consideration she received entirely to employment-related claims, leaving no consideration for her present, putatively non-employment-related claims. From

this, she concludes, it is apparent the parties must've intended to release only employment-related claims.

This proves too much. Ms. McKissick bases her argument entirely on a provision specifying that the "Employee agrees and acknowledges that additional consideration has been paid or will be paid by the Company (beyond that which would have otherwise been paid) in order to effect a valid waiver of Employee's claims under age discrimination laws." Separation Agreement and Release ¶ 7, Aplt. App. Vol. I at 144. This clause, of course, speaks only about consideration paid for waiver of *age discrimination* claims. Yet, Ms. McKissick doesn't dispute — indeed, she insists — that she also released a host of other kinds of (employment-related) claims, such as for other kinds of discrimination and violations of the Fair Labor Standards Act. Even so, no provision specifically allocates consideration for the release of *those* claims.

The conclusion to be drawn from all this is not that Ms. McKissick released only age discrimination claims, or only claims related to her employment. Rather, viewing the Agreement as a whole, the only plausible explanation is that the document's explicit allocation of consideration to (only) age discrimination claims is an effort to comply with the strictures of the Older Workers Benefit Protection Act, under which such recitations are essential to a valid waiver of claims arising under the Age Discrimination in Employment Act. *See Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090, 1092-93 (10th Cir. 2006). That Gemstar

sought to comply with a particular statutory directive doesn't suggest it didn't also bargain for the release of "any and all" claims between the parties.

4

Finally, even if the Release does purport to cover "non-employment-related claims," Ms. McKissick contends the Agreement itself carved out from the Release claims, like those before us, concerning her stock options. In pursuing this line of argument, Ms. McKissick relies on the "Stock Option Plan" clause in the Agreement, which states: "The acceptance of this Agreement will have no effect whatsoever on any rights Employee has or may have in the future to any portion of any non-qualified stock options vested and unexercised as of the Separation Date." Separation Agreement and Release ¶ 5, Aplt. App. Vol. I at 144. Ms. McKissick says this proviso is broad enough to permit her to bring suit "for damages related to the loss of value of the options, which right is incident to ownership of the options." Opening Br. at 22.

Not so. As the district court explained, the Stock Option Plan language "simply works to ensure [Ms. McKissick] the right to exercise her stock options that she had previously accrued from her work for the company." D. Ct. Order of Sept. 22, 2004, Aplt. App. Vol. I at 214. Far from being a carve-out from the Release (which appears in a separate paragraph after it), the Stock Option Plan clause is itself an exception from an earlier provision of the Agreement. An appreciation of the Agreement's structure is important here. Paragraph 2 of the

Agreement ends with the statement that "Employee also acknowledges that after the Separation Date, she is not eligible for or entitled to any of the benefits that the Company provides its employees, other than as expressly provided for herein." Separation Agreement and Release ¶ 2, Aplt. App. Vol. I at 143. The next three paragraphs — titled "Severance Benefits," "401(k) Plan," and "Stock Option Plan" — proceed to enumerate particular benefits Ms. McKissick *is* entitled to after her termination. Only after all this is said and done does the Agreement *then* turn to the question of what claims Ms. McKissick has released. Viewed in the context of the whole document, it's clear the Stock Option Plan clause is an assurance that Ms. McKissick retains stock options the Agreement might otherwise appear to strip from her. It is not a mousehole through which she is entitled to squeeze any elephant of a lawsuit somehow related to those options.

C

Even if we do not adopt her view that the Agreement unambiguously permits her claims, Ms. McKissick suggests that lingering factual questions nonetheless precluded entry of summary judgment for Gemstar. She offers three essential arguments why this is so. First, she maintains the Agreement is at least ambiguous on the crucial question what claims it releases, necessitating factual findings beyond the purview of the district court at summary judgment. Second, she faults the district court for failing to consider her asserted defenses to the enforcement of the Release, most notably economic duress. Finally, and at the

least, she says, she should've been given more time in discovery to develop her defenses. We consider each of these arguments in its turn.

1

Ms. McKissick begins by urging us to find that the Agreement, though seemingly clear on its face, harbors beneath its surface a latent ambiguity. That ambiguity, she submits, requires resort to extrinsic evidence to determine the true meaning of the contract. And that fact, she says, means summary judgment was improperly granted here.

A latent ambiguity arises when, despite a contract's facially unambiguous terms, "some extrinsic fact creates a necessity for interpretation or a choice between two or more possible meanings." *Cox v. Kaiser-Francis Oil Co.*, 152 P.3d 274, 278 (Okla. Civ. App. 2006). The extrinsic fact Ms. McKissick says does this here is the asserted value of her present claims — several million dollars. The $345,000 she received under the Agreement, she says, "would be absurdly low" consideration if it were intended to effect a release of those multimillion-dollar claims. Opening Br. at 28. Accordingly, she says, we must look at outside evidence to decide whether the Release's reference to "any and all" claims *really means* "any and all" claims.

We decline to join Ms. McKissick on this venture. As the district court noted in rejecting this same argument when Ms. McKissick raised it against the Individual Defendants' motion for summary judgment, the well-known costs,

risks, delays, and uncertainties of litigation mean parties "routinely settle cases for less money than what they might receive from a jury upon successful prosecution of [a] case." D. Ct. Order of Sept. 18, 2008 at 19, Aplt. App. Vol. II at 614. The disparity Ms. McKissick identifies simply gives us no reason to think anything more than this was going on.

Our conclusion is confirmed by *Cassity v. Pitts*, 839 P.2d 192, 195 (Okla. 1992). There, the Oklahoma Supreme Court weighed whether an agreement that "released forever any and all claims of whatsoever nature" against the defendant served to release claims for fraud that occurred before the agreement was signed, though the fraud wasn't discovered until after the document's execution. The court held "such broad language clearly contemplates some possible liability or possible future claim in addition to that under discussion by the parties at the time the release was executed." *Id.* (internal quotation marks and emphasis omitted). Much as here, the plaintiff there protested that the court should reform the contract to exclude the putatively unanticipated fraud claims because only $100 had been given as consideration for the release. But the Oklahoma court rejected this plea, holding that "[e]ven gross inadequacy of consideration" wouldn't justify departing from the plain terms of the contract. *Id.* (internal quotation marks and emphasis omitted). Though Ms. McKissick frames her consideration arguments

- 21 -

in slightly different terms than did the plaintiff in *Cassity*, we do not see how a different result in her case might be plausibly justified.[3]

2

Ms. McKissick maintains summary judgment for Gemstar on her claims was inappropriate for the additional reason that she had certain defenses to the Agreement's enforcement — chief among them, economic duress — that the district court failed to address. The problem is that, when Gemstar moved for summary judgment, Ms. McKissick never argued the Agreement was unenforceable on these grounds. She mentioned the defenses only in a footnote in her opposition brief and offered no argument how or why they precluded entry of summary judgment.

---

[3] Ms. McKissick cites us other Oklahoma authority she believes supports her position. But it is unavailing. *Haco Drilling Co. v. Hammer*, 426 P.2d 689, 694 (Okla. 1967), dealt with the prerequisites for a release of *future* damages — that is, damages arising *after* execution of the release. In such cases, the question is "whether the consideration paid . . . was for damages already sustained or to exempt defendant from any future damages" as well. *Id.* But the court's analysis didn't turn on its view whether the consideration was "enough" to cover future claims — rather, it considered whether the release was "clear, definite, and unambiguous" as to show the parties contemplated those damages when contracting. *Id.* And on this question the Oklahoma court concluded the release was, within its own four corners, "at least ambiguous." *Id.* at 695. *Haco Drilling*, then, tells us little about an unambiguous release of potential claims that *preceded* its execution. Ms. McKissick also offers *Safety Cab Co. v. Fair*, 74 P.2d 607 (Okla. 1937) (concerning release of tortfeasors not named in settlement agreement), and *Vitkus v. Beatrice Co.*, 11 F.3d 1535 (10th Cir. 1993) (concerning different meanings of a term in release and severance agreement it was meant to implement), in support of her cause, but, as the parenthetical summaries illustrate, these are even further afield than *Haco Drilling*.

- 22 -

Ms. McKissick's failure to develop her arguments adequately in the district court either forfeited (if her failure was unintentional) or waived (if her failure was intentional) them in that court. Which it is, however, we cannot tell. No doubt, Ms. McKissick would prefer forfeiture, where at least plain error appellate review is possible, rather than waiver where appellate review may be lost altogether. *See United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183-84 (10th Cir. 2009). But her opening appellate brief neither identifies which standard of review she thinks pertains to her argument nor provides any defense of that standard's application. This despite our longstanding rules requiring parties to identify where in the record they raised the point of error they seek to correct on appeal, 10th Cir. R. 28.2(C)(2), to state what standard of review they think applies to our review of that point of error, Fed. R. App. P. 28(a)(9)(B), and to develop any argument for reversal in their opening appellate brief or risk having it held waived, *see Hill v. Kemp*, 478 F.3d 1236, 1250-51 (10th Cir. 2007); *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J., sitting by designation).

In these circumstances, even if Ms. McKissick's duress arguments were merely forfeited before the *district court*, her failure to explain in her opening appellate brief why this is so and how they survive the plain error standard waives the arguments in *this* court. A party cannot count on us to pick out, argue for, and apply a standard of review for it on our own initiative, without the benefit of the

adversarial process, and without any opportunity for the adversely affected party to be heard on the question. *See Herrera v. City of Albuquerque*, 589 F.3d 1064, 1075 (10th Cir. 2009); *United States v. Solomon*, 399 F.3d 1231, 1238 (10th Cir. 2005); *cf. Hill*, 478 F.3d at 1251 (noting that, when left without briefing from the parties, courts "run the risk of an improvident or ill-advised opinion, given our dependence as an Article III court on the adversarial process" (internal quotation marks omitted)).

3

Ms. McKissick argues that the district court should have, at the very least, granted her more time to conduct discovery to develop evidence in aid of her defense. A party may, of course, seek to forestall summary judgment in favor of additional discovery if she submits an affidavit to the district court pursuant to Fed. R. Civ. P. 56(f) "explain[ing] why facts precluding summary judgment cannot be presented." *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) (internal quotation marks omitted); *see also id.* (further explaining requirements for Fed. R. Civ. P. 56(f) affidavit). The difficulty in this case is that Ms. McKissick failed to comply with Rule 56(f)'s commands. Rather than submit the affidavit the Rule expressly requires, she requested leave to conduct discovery in the body of her summary judgment opposition brief — and then only in a footnote. Ms. McKissick's failure to follow the process proscribed by Rule 56(f) is problematic for her under our precedents: "[O]ur cases make it

- 24 -

clear that where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Id.* 783-84 (internal quotation marks and alteration omitted). Put differently, the district court didn't abuse its discretion by denying a request that didn't conform to the express form requirements of the federal rules.

Perhaps realizing the infirmity of her discovery request during the district court's summary judgment proceedings, Ms. McKissick later filed an affidavit seeking discovery *after* the court issued its summary judgment order. The district court denied this request and in doing so again did not abuse its discretion. The plain language of "Rule 56(f) grants the district court the power to either deny a summary judgment motion or order a continuance; it does not grant the power to vacate a prior grant of summary judgment so that additional discovery can be conducted." *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 732-33 (10th Cir. 2006). If a party wants to stave off summary judgment in favor of additional discovery, she must file a Rule 56(f)-compliant affidavit *before*, not *after*, the court's decision. Of course, this isn't to say that the district court was powerless to revisit or reopen its summary judgment decision, but it is to say that it surely

didn't abuse its discretion in denying her additional time for discovery at this late stage.[4]

## III

Having resolved Ms. McKissick's claims against Gemstar, we turn to the company's counterclaim against her.  The district court granted summary judgment in the company's favor on its counterclaim, awarding Gemstar "its attorney fees and costs incurred in defending Plaintiff's claims against it, *and in obtaining summary judgment on its counterclaim*."  D. Ct. Order of Jan. 27, 2006, at 7, Aplt. App. Vol. II at 502 (emphasis added).  At the same time, the court denied Gemstar the additional relief it sought – specifically, the return of all the money it paid to Ms. McKissick under the Agreement.

Before us, Gemstar doesn't challenge the disposition of its counterclaim, but Ms. McKissick does, in part.  Though she doesn't dispute that the No Actions

---

[4] Ms. McKissick suggests her failure timely to raise her defenses should somehow have been excused because, by the time she filed her belated Rule 56(f) motion, she had (properly) raised those defenses and sought discovery in response to the Individual Defendants' then-pending motion to dismiss her claims. Because the question of enforceability of the Agreement was, in her view, identical with respect to both Gemstar and the Individual Defendants, had the court later ruled favorably on her defenses asserted against the Individual Defendants it would have had to reopen its still non-final summary judgment in Gemstar's favor.  We are not so sure.  Ms. McKissick cites us no authority holding that a litigant may resurrect an untimely argument against one party by dint of its later timely appearance with respect to another party.  Moreover, and in any event, the district court eventually rejected Ms. McKissick's defenses against the Individual Defendants on the merits.  Because we affirm that conclusion, *see infra* Section IV.A, we do not see how the district court might have erred in declining to reverse course with respect to Gemstar.

Clause permits Gemstar to recover any fees and costs it incurred in *defending* contractually barred claims, she argues that the Clause makes no provision for expenses incurred by the company in *prosecuting* its own counterclaims. So, in her view, the italicized portion of the district court's ruling quoted above was in error.[5]

With this, we agree. Gemstar stakes its claim to attorney fees entirely on the language of the No Actions Clause, which provides that if Ms. McKissick brings barred claims against Gemstar, "she will pay all costs and expenses of the Company and/or related persons in *defending against such charges, claims or actions* brought by her or on her behalf, including reasonable attorney's fees." Separation Agreement and Release ¶ 17, Aplt. App. Vol. I at 146 (emphasis added). The plain language of the Agreement makes no mention of costs associated with *prosecuting* claims, only *defending* them. And to "defend" a claim is to "ward off, avert, repel, restrain, prevent" it. IV Oxford English Dictionary 376 (2d ed. 1989). It is not to pursue, prosecute, or push a (counter)claim. Neither has Gemstar supplied any reason why we should deny

---

[5] Ms. McKissick also and again argues her alleged defenses, including duress, made the No Actions Clause unenforceable. The district court declined to consider this argument, which came only after the court had already enforced the Agreement in granting summary judgment for Gemstar. This was not an abuse of discretion. *See Elephant Butte Irr. Dist. of N.M. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1303 (10th Cir. 2008) ("A district court does not abuse its discretion in refusing to consider a theory raised for the first time at an advanced stage of litigation.").

effect to the ordinary and popular meaning of the contractual terms the company itself chose. The parties were, of course, free to define their terms as they wished. And they were free to provide for recoupment of costs incurred in connection with counterclaims or the litigation generally. But this they didn't do. The part of the district court's order awarding Gemstar fees for "obtaining summary judgment on its counterclaim" simply doesn't find support in the express terms of the parties' agreement. And our job is to give voice to and enforce the autonomous will of the parties, as expressed in the plain language of their deal, not to rewrite or perfect that deal.

Neither are the terms of the No Actions Clause entirely surprising. While Gemstar's counterclaim won it only attorney fees associated with defending Ms. McKissick's underlying suit, counterclaims can of course be used to seek damages well beyond that. And Gemstar's did. When filing its counterclaim, Gemstar also sought a refund of everything it had paid to Ms. McKissick under the Agreement. And, though ultimately unsuccessful, Gemstar surely incurred fees in pursuing this relief — fees the district court held Ms. McKissick must reimburse. It is hardly nonsensical to think that Ms. McKissick might've agreed to repay the company's costs in *defending* a barred suit but not to underwrite claims like this seeking affirmative relief against her.[6]

---

[6] At this point, we imagine one might well ask: What if Gemstar hadn't sought to collect its fees in a counterclaim but instead pursued them in a motion

(continued...)

- 28 -

In its brief and in a supplemental filing pursuant to Fed. R. App. P. 28(j), Gemstar cites a number of decisions that, it asserts, awarded fees in comparable circumstances. But that's not quite so. While some of these cases indicate that attorney fees awards for litigating attorney fees issues are sometimes appropriate under various statutes and other authorities, none addresses the pertinent question whether language of the sort found in the parties' No Actions Clause, language which speaks only about attorney fees for *defending* against barred claims, also authorizes a fee award for the separate endeavor of prosecuting a counterclaim seeking those fees.[7] In the absence of any authority to the contrary, we conclude

---

[6](...continued)
within Ms. McKissick's own suit? Could it have at least recovered the costs of pursuing such a motion, along with its costs in defending Ms. McKissick's suit? In this way, might it have effectively achieved much the same result it now seeks if only it had followed a different procedural tack? These are nice questions, but ones we need not decide. It's hardly unknown for a tactical choice to pursue this rather than that procedural option to affect the outcome of a case: every lawyer knows (or thinks he can hazard an educated guess), for example, how a choice of forum can affect the outcome of a lawsuit. In the case before us, Gemstar chose to pursue a counterclaim, not a motion in Ms. McKissick's suit; the parties chose the language of their contract; and that language permits Gemstar to recover only fees incurred in *defending* claims. We are no more free to undo Gemstar's tactical choices than we are to rewrite the terms of the parties' deal.

[7] *See Cummins v. Campbell*, 44 F.3d 847, 855 (10th Cir. 1994) (awarding fees under 42 U.S.C. § 1988, which permits a fee award "[i]n any action or proceeding to enforce" various civil rights laws); *Glass v. Pfeffer*, 849 F.2d 1261, 1264-66 (10th Cir. 1988) (affirming award of fees under "district court's inherent power" to impose sanctions); *Lubrizol Corp. v. Exxon Corp.*, 957 F.2d 1302, 1308 (5th Cir. 1992) (same); *Oral Roberts Univ. v. Anderson*, 11 F. Supp. 2d 1336, 1337 (N.D. Okla. 1997) ("In the event of litigation, the prevailing party shall be entitled to recover its reasonable attorney's fees." (quoting parties' agreement)

(continued...)

the provision means what it says and so does not permit such an award. Accordingly, we vacate the award of attorney fees to Gemstar and remand for the district court to recalculate it using only fees incurred defending against Ms. McKissick's claims.

IV

Having resolved Ms. McKissick's disputes with Gemstar, we must address the district court's rulings concerning the Individual Defendants' liability. Ms. McKissick asks us to hold the district court's entry of summary judgment for the Individual Defendants on her claims improper, because either (A) the Release doesn't specifically identify the Individual Defendants as Released Parties, or (B) her asserted defenses to the Agreement's enforcement precluded judgment in their favor. This we cannot do.

A

In the Release, Ms. McKissick pledged to release "any and all claims" she might have had against Gemstar or its "current and former employees, officers, directors, representatives, agents, shareholders, attorneys, accountants, partners, insurers, advisors, partnerships, assigns, successors, heirs, predecessors in interest, joint ventures, and affiliated persons (collectively "Released Parties")."

---

[7](...continued)
(emphasis omitted)); *Estate of Bell v. Olmstead*, 13 P.3d 86, 89-90 (Okla. Civ. App. 2000) (awarding fees under 12 Okla. Stat. § 936, which permits a fee award "[i]n any civil action to recover for labor or services rendered").

Separation Agreement and Release ¶ 6, Aplt. App. Vol. I at 144. For reasons that we've already explored, there's no doubt that Ms. McKissick's claims against the Individual Defendants, identical to those against the company, fall within the ambit of the Release's extermination of "any and all claims." It's also undisputed that the Individual Defendants are former Gemstar officers and directors, and so apparently among the parties Ms. McKissick released. What *is* disputed is whether the Agreement's listing of released parties is sufficient to establish an effective release of Mr. Yuen and Ms. Leung, or whether instead the names "Henry Yuen" and "Elsie Leung" had to appear in the Release for them to enjoy its protection.

Oklahoma follows what is sometimes, if somewhat beguilingly, called the "specific identity" approach to the release of joint tortfeasors. When a potential claimant contracts to release her claims against one party, others who might also be liable to her on those claims aren't released unless they are "designated by name or otherwise specifically identified." *Moss v. City of Oklahoma City*, 897 P.2d 280, 288 (Okla. 1995); *see also* 12 Okla. Stat. § 832(H)(1).[8] The specific

---

[8] *Moss* interpreted a previous version of 12 Okla. Stat. § 832(H)(1), which provided that a release did not discharge other tortfeasors from liability "unless its terms so provide." *Moss*, 897 P.2d at 284. The same day *Moss* was decided, the Oklahoma legislature amended that language in § 832(H)(1) to read "unless the other tort-feasor is specifically named." Ms. McKissick contends this means *Moss* is no longer good law, because the amendment omitted the alternative of "otherwise specifically identif[ying]" released tortfeasors, thus establishing a more restrictive standard. The result, she says, is that a joint tortfeasor may be

(continued...)

identity rule is designed to prevent the release of all potential tortfeasors upon the release of one by means of boilerplate, "generalized broad language which, in essence, . . . purports to release *the entire world* from any and all claims." *Moss*, 897 P.2d at 282 (emphasis added). So, for example, the contractual language *Moss* disapproved claimed to release not just the tortfeasor signing the contract but also "*any other person, firm or corporation*." *Id.* (emphasis added).

Like most rules, however, this one has its limits. When it adopted the specific identity rule, Oklahoma not only declined to give effect to the broad release before it (the so-called "complete bar" rule), but also the even more restrictive view that a party identified in a release should be released only if evidence demonstrates the parties really intended it (the so-called "intent" rule). *Id.* at 286. The court rejected the intent rule, explaining that it would carve out

[8](...continued)
released *only* if he or she is listed *by name* in the release. We cannot agree. At the time *Moss* was decided (and § 832(H)(1) amended), there were three competing views of the proper interpretation of "unless its terms so provide": the "specific identity" rule *Moss* adopted; the "complete bar" rule (under which broad language releasing "all other persons, firms or corporations" "operates as a complete bar to a plaintiff seeking to bring an action against an unnamed tortfeasor"); and the "intent" rule (which permits use of parol evidence to ascertain who the parties intended to release). *Moss*, 897 P.2d at 285-86. It would seem, then, that the "specifically named" language of the amendment to § 832(H)(1) was most likely an effort to adopt and codify the specific identity rule, rather than to stake out a unique, fourth position in this debate. *Cf. Lackey v. McDowell*, 415 S.E.2d 902, 903 n.3 (Ga. 1992) (defining "named" as "identified either by proper name or such other description as leaves no question of the identity of the party released"). In any event, given the absence of any authority suggesting that *Moss* has been abrogated, we apply it as describing the proper standard under § 832(H)(1) as amended.

an unlikely exception to the parol evidence rule. *Id.* at 288. So it is that the specific identity rule doesn't ask us to divine the parties' secret intentions. Similarly, the rule does not require that every released party be identified by name in some voluminous appendix dwarfing the release itself. Rather, the rule merely "require[s] some semblance of specificity" in the contractual language "before a non-settling tortfeasor [is] discharged." *Id.* 286. This is because the evil the specific identity rule aims to prevent is the "unwitting discharge of [other] tortfeasors," *id.* at 285; it isn't about enforcing parsimonious exactitude for its own sake.

The parties' Release complies with these principles. It doesn't purport to discharge *any and all* potential tortfeasors, as the *Moss* release did. Rather, the challenged portion of the Release simply discharges claims against Gemstar's employees, agents, and officers. These are all people for whom Gemstar might very well bear vicarious liability in some cases — and thus in this language the company still seeks, in a sense, to release itself. The class of persons covered by this language, moreover, was discernible to the parties in advance; they could tell the covered class before signing the Release; and, in this way, the Release can't be said to fall prey to the evil of effecting an unwitting discharge of unknown parties.

It would, as well, be quite a thing to read the specific identity rule to forbid language covering employees, agents, and officers, language widely employed in

commercial settings and regularly depended on for its efficacy.  Were we to hold such language ineffective, the settled expectations shared by parties to a great many commercial releases would be shaken.  Although no Oklahoma courts appear to have squarely dealt with the question, we very much doubt they would go so far.  A number of other states have concluded that the use of categories such as "employees," "agents," and "officers" doesn't tread on the ground forbidden by the specific identity rule, but rather suffices to identify, and so release, persons falling within those categories.  *See, e.g.*, *Aid Ins. Co. v. Davis County*, 426 N.W.2d 631, 633-34 (Iowa 1988) (stating that "such classes as 'employees,' 'partners' or 'officers'" may specifically identify released parties), *cited with approval by Moss*, 897 P.2d at 286; *Pakulski v. Garber*, 452 N.E.2d 1300, 1303 (Ohio 1983) (upholding release of named tortfeasor's "agents" and "employees").  And the Oklahoma Supreme Court itself has hinted that it would distinguish such categories from the broad boilerplate language it's held unenforceable under the specific identity rule.  *See Carmichael v. Beller*, 914 P.2d 1051, 1054 (Okla. 1996) ("[I]mmediately subsequent to the naming of the school entities (*and their agents, servants and employees*) as the discharged parties, the release did contain the following broad language purportedly also discharging:  any and all others . . . ." (internal quotation marks omitted) (emphasis added)).

In light of all this, we conclude the Release's inclusion of Gemstar's former officers and directors was sufficient under Oklahoma law to release Ms. McKissick's claims against the Individual Defendants.

B

Even if the terms of the Agreement purport to release her claims against the Individual Defendants, Ms. McKissick maintains that the Agreement is unenforceable because it was executed under economic duress. Unlike her duress claim against Gemstar, this one Ms. McKissick pursued in the district court and preserved in this court.

To avoid a contract on grounds of economic duress, Oklahoma law requires a litigant to show:

> A. The settlement was the result of a wrongful or unlawful act which
>    (1) was initiated by the coercing party,
>    (2) was committed with knowledge on the part of the coercing party of the impact it would have,
>    (3) was made for the purpose of, and reasonably adequate to secure coercion over the other, and
>    (4) resulted in obtaining undue advantage over the other.
>
> B. The act or acts complained of in (A) must have deprived the coerced party of its free will, leaving no adequate legal remedy nor reasonable alternative available. In this respect it is not enough that the alleged victim merely show, for example:
>    (1) its reluctance to settle,
>    (2) its financial embarrassment, or
>    (3) its business necessities.
>
> C. Detriment to the complaining party caused thereby.

*Centric Corp. v. Morrison-Knudsen Co.*, 731 P.2d 411, 417 (Okla. 1986).

- 35 -

Seeking to meet this standard, Ms. McKissick's claim of duress proceeds in this way. She incurred massive financial liabilities as she pursued her goal of establishing a horse ranch. Gemstar knew this, and repeatedly assured her that her job was secure. But the company nonetheless terminated her employment and presented her with an offer it knew she couldn't refuse: an attractive payout in exchange for releasing her valuable claims against the company (and the Individual Defendants). This shows the company unfairly exploited her desperate financial situation to exact an exceedingly favorable deal for itself and the Individual Defendants. And that, Ms. McKissick concludes, means neither Gemstar nor the Individual Defendants may now seek to hold her to that sham of a bargain.

The district court held that Ms. McKissick could not make out a claim of economic duress against the Individual Defendants as a matter of law because she couldn't establish a wrongful act on the company's part designed to secure coercion over her. We agree. The district court considered Ms. McKissick's argument carefully and at length, and we do not think it necessary to repeat its thoughtful analysis here. *See* D. Ct. Order of Sept. 18, 2008 at 22-29, Aplt. App. Vol. II at 617-24. We do observe, though, that in addition to the explanation given by the district court, Ms. McKissick's duress claim fails for another reason. Oklahoma law permits a party to rescind a contract executed under duress. But that requires, among other things, that the party "restore to the other

party everything of value which [she] has received from [the other party] under the contract; or . . . offer to restore the same." 15 Okla. Stat. § 235(2). Ms. McKissick hasn't returned the benefits she received under the Agreement or explained how she offered to do so. Given that failure, it is difficult indeed to see how she could make out a colorable claim of duress.[9]

V

Finally, we reach the district court's award of attorney fees to the Individual Defendants. Ms. McKissick contends the award should be vacated or reversed for essentially two reasons: first, the district court lacked jurisdiction to award such fees after she'd appealed the case to this court; second, the district court erroneously concluded that the No Actions Clause entitles the Individual Defendants to attorney fees. We reject the first of these arguments, but agree with the second.

---

[9] Ms. McKissick also contends the Agreement was executed under mistake, because the parties didn't intend to release any claims but those arising out of her employment or termination, despite the Release's language to the contrary. We agree with the district court that she hasn't shown that Gemstar made the mistake she alleges, and that Ms. McKissick hasn't demonstrated inequitable conduct by Gemstar that would excuse her unilateral mistake on that point. *See* D. Ct. Order of Sept. 18, 2008 at 20-22, Aplt. App. Vol. II at 615-17. Ms. McKissick also repeats her arguments alleging ambiguity and lack of consideration in an effort to defeat summary judgment for the Individual Defendants. For the same reasons we gave with respect to summary judgment for Gemstar, we reject those arguments. *See supra* Section II.C.1.

A

Beginning with Ms. McKissick's jurisdictional challenge, it perhaps goes without saying that "[e]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review . . . . When the lower federal court lacks jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (internal quotation marks omitted). So it is that, before we may address the merits of the fee award to the Individual Defendants, we must first assure ourselves that the district court possessed jurisdiction to consider their motion for fees.

In Ms. McKissick's view, the Individual Defendants' motion for attorney fees is properly viewed as a substantive contractual claim for breach of the parties' contract. For this reason, she says, they actually seek attorney fees as part of their *damages*. And this, she contends, means the Individual Defendants' fee request is inextricably interwoven with the merits of the appeal, and thus outside the district court's post-appeal jurisdiction. In support of her argument, Ms. McKissick has filed and asks us to grant a motion to vacate the district court's attorney award.

This we cannot do. As Ms. McKissick observes, the general rule is that, when a litigant files a notice of appeal, the district court loses jurisdiction over

the case, save for "collateral matters not involved in the appeal." *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1237 (10th Cir. 1998) (internal quotation marks omitted). But an award of attorney fees for the case at issue is perhaps the paradigmatic example of a collateral issue a district court may entertain after an appeal has been taken to this court. *Id.* Accordingly, the Supreme Court has laid down "a uniform rule that *an unresolved issue of attorney's fees for the litigation in question*" doesn't prevent a district court judgment from being final and appealable; rather, the district court retains jurisdiction over the fee issue while the court of appeals has jurisdiction over the appeal. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202 (1988) (emphasis added). This is so regardless whether the fees are considered "'merits' or 'nonmerits,'" and regardless whether the claimant "specifically requested attorney's fees as part of the prayer in his complaint" or sought them by motion later — all the better to provide a clear, workable rule for litigants in federal court. *Id.* at 201-02. The critical consideration, in the Supreme Court's view, is not the "preservation of conceptual consistency in the status of a particular fee authorization as 'merits' or 'nonmerits,'" but rather the administrative virtues of a predictable, bright-line jurisdictional rule. *Id.* at 202; *cf. Hertz Corp. v. Friend*, --- U.S. ---, ---, 130 S.Ct. 1181, 1193, (2010) (explaining that "[s]imple jurisdictional rules . . . promote greater predictability"). Under that bright-line rule, outstanding fee issues for the litigation at hand are considered collateral to the final judgment, even "when the

statutory or decisional law authorizing them makes plain . . . that they are to be part of the merits judgment." *Budinich*, 486 U.S. at 201-02.

Ms. McKissick says our decisions in *North American Specialty Insurance Co. v. Corrections Medical Services, Inc.*, 527 F.3d 1033 (10th Cir. 2008), and *Lampkin v. International Union*, 154 F.3d 1136 (10th Cir. 1998), require a different result. But neither does any such thing. Those cases didn't involve a request for fees *in the case at hand*; instead, they both involved a claim for fees incurred in *prior* litigation. And we said, simply and unsurprisingly, that in *those* circumstances the fee question may have to be litigated at trial as a component of the plaintiff's damages, rather than ascertained in a post-judgment collateral proceeding. So, for example, *North American* involved the question of attorney fees an insured incurred in defending against an earlier lawsuit for which its insurer refused to provide a defense, as required by the parties' insurance policy. 527 F.3d at 1038-39. The fees at issue weren't "attributable to the case" at issue, *Budinich*, 486 U.S. at 203, but the result of a previous independent litigation. Likewise in *Lampkin*: there, "the award of attorneys' fees [was] an award of compensatory damages for [the defendant union's] breach of the duty of fair representation [in earlier litigation against the plaintiff's employer] . . . which only incidentally happen[ed] to be measured . . . solely by the attorneys' fees incurred by the plaintiff." 154 F.3d at 1140; *see also id.* ("This limitation of the [*Budinich*] Court's holding to attorneys' fees requests for the 'litigation at hand'

is crucial to our resolution of the jurisdictional issue here.").  These cases, then, give us no reason to disregard *Budinich*'s clear command:  the question of attorney fees *for the litigation at hand* is a collateral issue, one that remains within the district court's jurisdiction even after judgment is entered on the merits and an appeal of that judgment is underway.[10]

The vast majority of our sister circuits have come to this same conclusion. *See, e.g.*, *O&G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 167-68 (2d Cir. 2008); *Carolina Power & Light Co. v. Dynergy Mktg. & Trade*, 415 F.3d 354, 362 (4th Cir. 2005) (noting that fee award at issue included fees beyond merely those for litigation at hand); *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 137-38 (3d Cir. 2001); *United States ex rel. Familian Nw., Inc. v. RB & B Contractors, Inc.*, 21 F.3d 952, 955 (9th Cir. 1994); *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1315 (2d Cir. 1993) (discussing *Budinich* in context of right to jury trial); *id.* at 1317 (Jacobs, J., concurring) (noting that case did not involve "contractual indemnification for fees incurred in a separate litigation against a third party"); *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 702 (7th Cir. 1992); *Vargas v. Hudson County Bd. of Elections*, 949 F.2d 665, 669-70 (3d Cir.

_____

[10]  None of this is to say a post-judgment motion for attorney fees claimed pursuant to a contract will necessarily be procedurally proper.  *See* Fed. R. Civ. P. 54(d)(2)(A) & Advisory Committee Notes to 1993 Amendments (motion for attorney fees does not apply when "the substantive law requires those fees to be proved at trial as an element of damages").  It is only to say that any defect there might be in such a proceeding is not *jurisdictional*.  *Cf. Capital Asset Research Corp. v. Finnegan*, 216 F.3d 1268, 1269-70 (11th Cir. 2000) (per curiam).

1991); *First Nationwide Bank v. Summer House Joint Venture*, 902 F.2d 1197, 1199-1200 (5th Cir. 1990); *but see Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. Medpartners, Inc.*, 312 F.3d 1349, 1355 (11th Cir. 2002).[11]  And we believe it best comports with the Supreme Court's direction in *Budinich*, which we are bound to obey.

B

Having determined the district court possessed *jurisdiction* to award the Individual Defendants attorney fees, we next confront the question whether doing so was *proper*.

The parties' dispute here centers on the terms of the No Actions Clause.  In that provision, Ms. McKissick represented "that she will not file lawsuits against *the Company* for claims arising up to and including the Effective Date." Separation Agreement and Release ¶ 17, Aplt. App. Vol. I at 146 (emphasis added).  If she breached that promise "by bringing or maintaining any charges, claims, grievances, or lawsuits contrary to this provision," the No Actions Clause required her to "pay all costs and expenses of the Company and/or related person

---

[11]  The Eleventh Circuit has suggested that "a request for attorneys' fees pursuant to a contractual clause is considered a substantive issue," even when the fees are for the litigation at hand.  *Brandon, Jones*, 312 F.3d at 1355.  The court based this conclusion, however, on pre-*Budinich* circuit case law, and didn't even consider what effect *Budinich* might have on the issue.  *See id.* (citing *Ierna v. Arthur Murray Int'l, Inc.*, 833 F.2d 1472 (11th Cir. 1987)); *see also Adeduntan v. Hosp. Auth. of Clarke County*, 249 F. App'x 151, 155 & n.1 (11th Cir. 2007) (unpublished) (noting this fact).  It thus provides little persuasive basis for us to find for Ms. McKissick on her jurisdictional argument.

in defending against *such charges, claims or actions.*"  Separation Agreement and Release ¶ 17, Aplt. App. Vol. I at 146 (emphasis added).  The No Actions Clause, then, is narrower than the language governing Ms. McKissick's release of claims: while the Release covers both Gemstar and a passel of other persons (including former officers and directors such as the Individual Defendants), the No Actions provision provides only that Ms. McKissick won't sue *Gemstar itself.*  Her suit against the Individual Defendants thus doesn't (and can't) violate the No Actions provision, let alone trigger that provision's attorney fee guarantee.[12]

The Individual Defendants acknowledge as much, so they seek to hang their attorney fee hat on a different hook.  Though Ms. McKissick could violate the No Actions provision only by suing Gemstar, they argue, the obligation a violation of that provision triggered was broader — requiring Ms. McKissick to pay not only the company's attorney fees, but also those of "related persons."  And, as former Gemstar officers and directors, the Individual Defendants maintain they must be "related persons."

Maybe so.  But this argument itself misses a crucial further limitation in the language of the No Actions Clause.  The Clause requires Ms. McKissick to pay only the costs of "defending against *such charges, claims or actions*" — that is,

---

[12]  Like Gemstar, the Individual Defendants stake their claim to attorney fees entirely on the No Actions Clause.  Whether the Individual Defendants might have been entitled to fees by dint of Ms. McKissick's violation of the Release, rather than the No Actions Clause, is a question the parties haven't pursued and so neither will we.

the charges, claims, or actions *against Gemstar* she promised not to bring. Separation Agreement and Release ¶ 17, Aplt. App. Vol. I at 146. It follows that the only fees for related persons Ms. McKissick agreed to pay were fees related persons incurred (perhaps as witnesses) in charges, claims, or actions she pursued against Gemstar. The claims on which the Individual Defendants seek fees here, however, are plainly not claims *against Gemstar*, but rather claims *against the Individual Defendants*. As such, those claims do not fall within the scope of the No Action Clause's fee guarantee. Once again, one could well imagine a different provision more generous than this to related persons. But our task is to enforce the plain terms of the parties' agreement, not to try to improve upon them.

Seeking to avoid this result, the Individual Defendants suggest that, because Ms. McKissick filed a single complaint alleging identical causes of action against both Gemstar and the Individual Defendants, the claims against them were in fact "such . . . claims." Yet this, too, is an untenable reading of the contract's plain language. Ms. McKissick did bring the same causes of action against both Gemstar and the Individual Defendants (for fraud, negligent misrepresentation, and Exchange Act violations). But her claims against the Individual Defendants had to stand or fall on their own. They became no less claims against the Individual Defendants simply because of their inclusion in a consolidated lawsuit involving claims against Gemstar. It is beyond cavil, for

example, that the Individual Defendants might have sought, in appropriate circumstances, to have had the claims against them transferred to a different venue, tried at a different time, or (as happened here) assessed on a different procedural track. The claims against them have always been distinct from — even if based on the same legal theories and conduct and brought in the same complaint as — the claims against Gemstar. Indeed, we doubt very much that, if the shoe were on the other foot and Gemstar lost a verdict, the Individual Defendants would gladly accept responsibility for the company's judgment because the claims were really against them, too.

\* \* \*

At the end of it all, our essential holdings are these. We affirm the district court's grants of summary judgment to Gemstar and to the Individual Defendants on Ms. McKissick's claims against them. We vacate its grant of attorney fees to Gemstar and remand to the district court to recalculate them in a manner consistent with this opinion. We deny Ms. McKissick's motion to vacate. Finally, we reverse the judgment of the district court awarding attorney fees to the Individual Defendants.

*So ordered.*